# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL ASSOCIATION OF CHEMICAL
DISTRIBUTORS, d/b/a ALLIANCE FOR
CHEMICAL DISTRIBUTION; AMERICAN
CHEMISTRY COUNCIL; AMERICAN FUEL &
PETROCHEMICAL MANUFACTURERS;
AMERICAN PETROLEUM INSTITUTE;
CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA; and
SOCIETY OF CHEMICAL
MANUFACTURERS & AFFILIATES,

Case No. 25-1075

*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY,

*Respondent*.

## PETITION FOR REVIEW

Pursuant to Section 307(b)(1) of the Clean Air Act, 42 U.S.C.

§ 7607(b)(1); Federal Rule of Appellate Procedure 15(a); and D.C. Circuit

Rule 15, the National Association of Chemical Distributors, d/b/a Alliance

for Chemical Distribution, American Chemistry Council, American Fuel

& Petrochemical Manufacturers, American Petroleum Institute,

Chamber of Commerce of the United States of America, and Society of

Chemical Manufacturers & Affiliates (collectively "RMP Coalition"), hereby petition for review of a final action of the United States Environmental Protection Agency denying the RMP Coalition's petition for reconsideration. *See* Letter from Michael S. Regan Denying RMP Coalition's Petition for Reconsideration (Dec. 26, 2024) ("Decision Letter"); *see also* Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act; Safer Communities by Chemical Accident Prevention; Final Action on Petition for Reconsideration, 89 Fed. Reg. 106,479 (Dec. 30, 2024) ("Notice"). A copy of the Notice is attached as Exhibit A to this petition. A copy of the Decision Letter is attached as Exhibit B. A copy of the RMP Coalition's petition for reconsideration is attached as Exhibit C. This Court has jurisdiction and is the proper venue for this action pursuant to 42 U.S.C. § 7607(b)(1).

Dated: February 24, 2025

Respectfully submitted,

/s/ *Justin A. Savage*

MATTHEW M. KING
AMERICAN CHEMISTRY COUNCIL
700 2nd Street, NE
Washington, DC 20002
(202) 249-7012
*Counsel for Petitioner American Chemistry Council*

RYAN MEYERS
JOHN WAGNER
MICHELE SCHOEPPE
AMERICAN PETROLEUM INSTITUTE
200 Mass. Ave., NW
Washington, DC 20001
*Counsel for Petitioner American Petroleum Institute*

ANDREW R. VARCOE
CHRISTOPHER J. WALKER
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337
*Counsel for Petitioner Chamber of Commerce of the United States of America*

JUSTIN A. SAVAGE
KWAKU A. AKOWUAH
MANUEL VALLE
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8853
jsavage@sidley.com
*Counsel for Petitioners*

RICHARD MOSKOWITZ
TYLER KUBIK
AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS
1800 M. Street, NW
Washington, DC 20036
*Counsel for Petitioner American Fuel & Petrochemical Manufacturers*

ROBERT F. HELMINIAK
SOCIETY OF CHEMICAL MANUFACTURERS & AFFILIATES
1400 Crystal Drive, Suite 630
Arlington, VA 22202
(571) 348-5107
*Counsel for Petitioner the Society of Chemical Manufacturers and Affiliates*

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL ASSOCIATION OF CHEMICAL
DISTRIBUTORS, d/b/a ALLIANCE FOR
CHEMICAL DISTRIBUTION; AMERICAN
CHEMISTRY COUNCIL; AMERICAN FUEL &
PETROCHEMICAL MANUFACTURERS;
AMERICAN PETROLEUM INSTITUTE;
CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA; and
SOCIETY OF CHEMICAL
MANUFACTURERS & AFFILIATES,

Case No. __-____

*Petitioners,*

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY,

*Respondent.*

## RULE 26.1 STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C.

Circuit Rule 26.1, the National Association of Chemical Distributors,

d/b/a Alliance for Chemical Distribution, American Chemistry Council,

American Fuel & Petrochemical Manufacturers, American Petroleum

Institute, Chamber of Commerce of the United States of America, and

Society of Chemical Manufacturers & Affiliates provide the following corporate disclosure statements:

The National Association of Chemical Distributors, d/b/a Alliance for Chemical Distribution (ACD) is a trade association of more than 400 chemical distribution industry members that provides the education, connection, standards, and advocacy needed to responsibly move the essential products our world depends on. As leaders in the $27 billion chemical distribution industry, ACD member companies commit to the highest standards in quality, safety, sustainability, and performance through ACD Responsible Distribution™. ACD is a "trade association" for purposes of Circuit Rule 26.1(b). ACD has no parent corporation, and no publicly held company has 10% or greater ownership interest in ACD.

The American Chemistry Council (ACC) represents the leading companies engaged in the business of chemistry. ACC members apply the science of chemistry to make innovative products and services that make people's lives better, healthier, and safer. ACC is committed to improved environmental, health, and safety performance through Responsible Care®; common sense advocacy designed to address major public policy issues; and health and environmental research and product testing. The

business of chemistry is a $639 billion enterprise and a key element of the nation's economy. It is among the largest exporters in the nation, accounting for fourteen percent of all U.S. goods exported. ACC states that it is a "trade association" for purposes of Circuit Rule 26.1(b). ACC has no parent corporation, and no publicly held company has 10% or greater ownership in ACC.

American Fuel & Petrochemical Manufacturers (AFPM) is a national trade association that represents nearly all American refining and petrochemical manufacturing capacity, including the midstream transport that moves products from facilities to consumers. These industries provide jobs, directly and indirectly, to more than three million Americans, contribute to our economic and national security, and enable the production of thousands of vital products used by families and businesses throughout the United States. AFPM is committed to the development of sound policies that enable our members to supply the fuel and petrochemicals that growing populations need to thrive in an environmentally sustainable way. AFPM has no parent corporation, and no publicly held corporation has a 10% or greater ownership in AFPM.

American Petroleum Institute (API) represents all segments of America's natural gas and oil industry, which supports more than 11 million U.S. jobs and is backed by a growing grassroots movement of millions of Americans. API's nearly 600 members produce, process, and distribute the majority of the Nation's energy, and participate in API Energy Excellence, which is accelerating environmental and safety progress by fostering new technologies and transparent reporting. API certifies that it is incorporated under the laws of the District of Columbia. API has no parent entity, and no publicly held corporation or similarly situated legal entity has 10% or greater ownership of API.

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. The Chamber states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent

corporation, and no publicly held company has 10% or greater ownership in the Chamber.

The Society of Chemical Manufacturers & Affiliates (SOCMA) is the national trade association dedicated to the specialty and fine chemical industry. Founded in 1921, SOCMA represents a diverse membership of chemical companies who batch manufacture new and innovative chemistries used in a wide range of commercial, industrial, and consumer products. SOCMA maintains a strong record of member service through programs that maximize commercial opportunities, enhance regulatory and legal compliance, and promote industry stewardship. SOCMA has no parent company nor is it a publicly held company. SOCMA is a non-profit organization incorporated in the state of New York. No publicly held company has 10% or greater ownership in SOCMA.

Dated: February 24, 2025

Respectfully submitted,

/s/ *Justin A. Savage*
JUSTIN A. SAVAGE
KWAKU A. AKOWUAH
MANUEL VALLE
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8853
jsavage@sidley.com
*Counsel for Petitioners*

MATTHEW M. KING
AMERICAN CHEMISTRY COUNCIL
700 2nd Street, NE
Washington, DC 20002
(202) 249-7012
*Counsel for Petitioner American Chemistry Council*

RYAN MEYERS
JOHN WAGNER
MICHELE SCHOEPPE
AMERICAN PETROLEUM INSTITUTE
200 Mass. Ave., NW
Washington, DC 20001
*Counsel for Petitioner American Petroleum Institute*

ANDREW R. VARCOE
CHRISTOPHER J. WALKER
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337
*Counsel for Petitioner Chamber of Commerce of the United States of America*

RICHARD MOSKOWITZ
TYLER KUBIK
AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS
1800 M. Street, NW
Washington, DC 20036
*Counsel for Petitioner American Fuel & Petrochemical Manufacturers*

ROBERT F. HELMINIAK
SOCIETY OF CHEMICAL MANUFACTURERS & AFFILIATES
1400 Crystal Drive, Suite 630
Arlington, VA 22202
(571) 348-5107
*Counsel for Petitioner the Society of Chemical Manufacturers and Affiliates*

# CERTIFICATE OF SERVICE

Pursuant to Federal Rules of Appellate Procedure 3(d), 15(c), and 25, D.C. Circuit Rules 15(a) and 25, and 40 C.F.R. § 23.12(a), I hereby certify that I have caused the foregoing Petition for Review and Rule 26.1 Statement to be served by U.S. Mail, this 24th day of February, 2025, upon each of the following:

Hon. Lee Zeldin, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

U.S. Environmental Protection Agency
Correspondence Control Unit
Office of General Counsel (2311)
1200 Pennsylvania Avenue, NW
Washington, DC 20460

Hon. Pamela Bondi
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530

Hon. Adam Gustafson
Principal Deputy Assistant Attorney General
Environmental and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530

Dated: February 24, 2025

Respectfully submitted,

/s/ *Justin A. Savage*

Justin A. Savage
Kwaku A. Akowuah
Manuel Valle
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8853
jsavage@sidley.com

*Counsel for Petitioners*

# Exhibit A

# Exhibit B





Under Secretary for Infrastructure. By Redelegation Order No.S3–DEL–WAPA1–2023, effective April 10, 2023, the Under Secretary for Infrastructure further redelegated the authority to confirm, approve, and place such rates into effect on an interim basis to WAPA's Administrator.

## Availability of Information

All brochures, studies, comments, letters, memorandums, or other documents that UGP initiates or uses to develop the proposed formula rates are available for inspection and copying at the Upper Great Plains Regional office located at 2900 4th Ave. North, 6th Floor, Billings, Montana. Many of these documents and supporting information are also available on UGP's Rates website at: *www.wapa.gov/about-wapa/regions/ugp/ugp-rates* and other posting locations noted.

## Ratemaking Procedure Requirements

### Environmental Compliance

WAPA is in the process of determining whether an environmental assessment or an environmental impact statement should be prepared or if this action can be categorically excluded from those requirements.[7]

### Determination Under Executive Order 12866

WAPA has an exemption from centralized regulatory review under Executive Order 12866; accordingly, no clearance of this notice by the Office of Management and Budget is required.

### Signing Authority

This document of the Department of Energy was signed on December 19, 2024, by Tracey A. LeBeau, Administrator, Western Area Power Administration, pursuant to delegated authority from the Secretary of Energy. That document, with the original signature and date, is maintained by DOE. For administrative purposes only, and in compliance with requirements of the Office of the Federal Register, the undersigned DOE Federal Register Liaison Officer has been authorized to sign and submit the document in electronic format for publication, as an official document of the Department of Energy. This administrative process in no way alters the legal effect of this document upon publication in the **Federal Register**.

Signed in Washington, DC, on December 19, 2024.

**Jennifer Hartzell,**
*Alternate Federal Register Liaison Officer, U.S. Department of Energy.*
[FR Doc. 2024–30858 Filed 12–27–24; 8:45 am]
**BILLING CODE 6450–01–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

**[EPA–HQ–OLEM–2022–0174; FRL 12525–01–OLEM]**

### Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act; Safer Communities by Chemical Accident Prevention; Final Action on Petition for Reconsideration

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of final action denying petition for reconsideration.

**SUMMARY:** The U.S. Environmental Protection Agency (EPA) received a petition for reconsideration of the final revisions to the Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act; Safer Communities by Chemical Accident Prevention, published in the **Federal Register** on March 11, 2024. The agency is providing notice that it is denying the petition for reconsideration. The basis for EPA's action is set out fully in a letter addressed to the petitioner, available in the rulemaking docket.

**DATES:** December 30, 2024.

**FOR FURTHER INFORMATION CONTACT:** Kristina Guarino, United States Environmental Protection Agency, Office of Land and Emergency Management, 1200 Pennsylvania Ave. NW (Mail Code 5104A), Washington, DC 20460; telephone number: (202) 566–1235; email address: *guarino.kristina@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. How can I get copies of this document and other related information?

A copy of this **Federal Register** notice, the petition for reconsideration, and the letter describing the full basis for this action are available in the rulemaking docket (Docket ID No. EPA–HQ–OLEM–2022–0174). Publicly available docket materials are available electronically via *www.regulations.gov.* In addition, following signature, an electronic copy of this final action and the letter will be available on the internet at *https://www.epa.gov/rmp/risk-management-program-safer-communities-chemical-accident-prevention-final-rule.* Publicly available docket materials are available either electronically at *https://www.regulations.gov* or in hard copy at the Environmental Protection Agency, EPA Docket Center, William Jefferson Clinton West Building, Room 3334, 1301 Constitution Ave. NW, Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744. For further information on EPA Docket Center services and the current status, please visit *https://www.epa.gov/dockets.*

### II. Judicial Review

Section 307(b)(1) of the CAA indicates which Federal Courts of Appeal have venue for petitions of review of final actions by the EPA. This section provides, in part, that "a petition for review of action of the Administrator in promulgating . . . any standard of performance or requirement under section [111] of [the CAA]," or any other "nationally applicable" final action, "may be filed only in the United States Court of Appeals for the District of Columbia." The EPA has determined that its action denying the petition for reconsideration is nationally applicable for purposes of CAA section 307(b)(1) because the action directly relates to the Risk Management Program regulations promulgated under CAA section 112(r), which are nationally applicable requirements. Thus, any petition for review of the final letter denying the petition for reconsideration must be filed in the Court of Appeals for the District of Columbia Circuit on or before February 28, 2025.

**Michael S. Regan,**
*Administrator.*
[FR Doc. 2024–31216 Filed 12–27–24; 8:45 am]
**BILLING CODE 6560–50–P**

---

## FEDERAL ACCOUNTING STANDARDS ADVISORY BOARD

### Notice of Appointment of Board Member to the Federal Accounting Standards Advisory Board

**AGENCY:** Federal Accounting Standards Advisory Board.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that David Vaudt has been appointed to the Federal Accounting Standards Advisory Board (FASAB or "the Board"). Mr. Vaudt's five-year term will begin on January 27, 2025.

---

[7] In compliance with the National Environmental Policy Act (NEPA) of 1969, as amended, 42 U.S.C. 4321–4347; the Council on Environmental Quality Regulations for implementing NEPA (40 CFR parts 1500–1508); and DOE NEPA Implementing Procedures and Guidelines (10 CFR part 1021).



**THE ADMINISTRATOR**

WASHINGTON, D.C. 20460

December 26, 2024

Mr. Justin A. Savage
Global Co-Leader and Partner
Environmental Practice
Sidley Austin LLP
1501 K Street, NW
Washington, D.C.  20005

Dear Mr. Savage:

I am responding to your May 10, 2024, petition for reconsideration on behalf of the RMP Coalition, consisting of the National Association of Chemical Distributors (NACD), d/b/a Alliance for Chemical Distribution, the American Chemistry Council (ACC), the American Fuel & Petrochemical Manufacturers (AFPM), the American Petroleum Institute (API), the Chamber of Commerce of the United States of America, and the Society of Chemical Manufacturers & Affiliates (SOCMA) (collectively, the "petitioners") regarding the U.S. Environmental Protection Agency's (EPA) final rule titled "Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act; Safer Communities by Chemical Accident Prevention" ("2024 Safer Communities final rule," 89 Fed. Reg. 17622; March 11, 2024). The 2024 Safer Communities by Chemical Accident Prevention (Safer Communities) final rule revised the Risk Management Program (RMP) to further protect vulnerable communities from chemical accidents, especially those living near facilities in industry sectors with high accident rates. EPA included new safeguards such as requiring a safer technologies and alternatives analysis (STAA); implementation of safeguard measures in certain cases; advancing employee participation, training, and opportunities for employee decision-making in facility accident prevention; requiring third-party compliance audits; and enhancing the public availability of chemical hazard information, among other requirements.

Your petition alleged four primary objections to the 2024 Safer Communities final rule:

A.   The final rule includes new and extraordinarily burdensome STAA requirements, which were not available for comment and are unlawful.
B.   The final rule's expanded information availability requirements compel disclosure of additional sensitive information without adequate justification.
C.   The final rule imposes additional, unnecessary employee participation provisions.
D.   The final rule adds two new provisions relating to monitoring equipment.

The petition alleges that each objection either arose after the period for public comment on the 2024 Safer Communities final rule or was impracticable to raise during that comment period. The petition also alleges that these objections are of central relevance to the outcome of the rule. The petition concludes that EPA must grant reconsideration pursuant to section 307(d)(7)(B) of the Clean Air Act (CAA) and stay the 2024 Safer Communities final rule.

After careful review of the objections raised in the petition for reconsideration, EPA denies the petition, as well as the request that the 2024 Safer Communities final rule be stayed. The petition fails to establish that the objections meet the criteria for mandatory reconsideration under section 307(d)(7)(B) of the CAA. Section 307(d)(7)(B) of the CAA requires EPA to convene a proceeding for reconsideration of a rule if a party raising an objection to the rule:

> "... can demonstrate to the Administrator that it was impracticable to raise such objection within [the public comment period] or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule."

The requirement to convene a proceeding to reconsider a rule is, thus, based on the petitioner demonstrating to EPA both: (1) that it was impracticable to raise the objection during the comment period, or that the grounds for such objection arose after the comment period but within the time specified for judicial review (*i.e.,* within 60 days after publication of the final rulemaking notice in the Federal Register (FR), see CAA section 307(b)(1)); and (2) that the objection is of central relevance to the outcome of the rule.[1]

The discussion below addresses each of the objections raised in the petition.

A.      **Petitioners Allege that New STAA Requirements in the Final Rule are Extraordinarily Burdensome and Unlawful**

Petitioners' first objection is that the 2024 Safer Communities final rule includes new and extraordinarily burdensome STAA requirements, which were not available for comment and are unlawful. Petitioners allege that there were several procedural deficiencies in EPA's 2024 Safer Communities final rulemaking which prevented petitioners from being able to comment effectively on the provisions of the 2024 Safer Communities final rule. Petitioners provide seven arguments to support this objection, including petitioners' claim that:

i.      EPA did not provide adequate notice for petitioners to comment on the implementation mandate,

ii.      EPA did not provide a sufficient reasoned basis for imposing the costs of the implementation mandate on specific facilities,

iii.      The hierarchy of controls that facilities must implement is unclear,

---

[1] An objection is of "central relevance" to the outcome of a rule "if it provides substantial support for the argument that the regulation should be revised." *See Coal. for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 125 (D.C. Cir. 2012) (internal citation and quotation omitted).

iv.  Stakeholders were not provided with the opportunity to comment on requirements of the implementation mandate that remain unclear,

v.  The definition of "practicable" imposed by the rule violates CAA section 112,

vi.  EPA does not have the authority to adopt the implementation mandate, and

vii.  Congressional authorization would be required to impose a mandate to adopt inherently safer technology/inherently safer design (IST/ISD).

EPA addresses each of these arguments below.

  i.  **Petitioners allege that the Agency provided inadequate notice of the implementation mandate.**

Petitioners argue that the Agency did not provide the opportunity for meaningful public comment on the STAA implementation mandate. Petitioners state, "although the Proposed Rule solicited comments on whether the Agency should require implementation of inherently safer technology/inherently safer design ('IST/ISD') and STAAs, the Agency did not specifically solicit comment on the relative benefits of implementing passive measures, active measures, or procedural measures. Most importantly, none of the particulars of the Final Rule's implementation mandate or its extensive new regulatory language were available for the public to comment on or even consider."

EPA finds that this claim does not satisfy the requirements of mandatory reconsideration under CAA section 307(d)(7)(B). The issue of implementation of IST/ISD and STAA was plainly raised for comment in the 2022 Safer Communities by Chemical Accident Prevention ("2022 Safer Communities") proposed rule. (87 Fed. Reg. 53556, 53580, Aug. 31, 2022).[2] Specifically, the 2022 Safer Communities proposed rule stated, "EPA seeks comment on whether the Agency should require implementation of technically practicable IST/ISD and STAAs." *Id.* While the 2022 Safer Communities proposed rule suggested reasons why an implementation requirement may not have been the preferred option, *id.*, it also outlined comments in favor of an implementation requirement received during the listening sessions conducted prior to the 2022 Safer Communities proposed rule. *Id.* at 53576-77. As stated in the 2022 Safer Communities proposed rule preamble, "During EPA's 2021 listening sessions, approximately 245 commenters provided feedback on STAA. Many commenters, including individual commenters, professional associations, groups, labor organizations, an association of government agencies, and a Federal agency, supported EPA restoring the 2017 amendments rule[3] requirement for facilities to assess safer technologies and substitute safer alternatives in their processes where feasible." *Id.* at 53576. Other commenters provided feedback that the hierarchy of controls should be used to reduce hazards. *Id.* One commenter specifically pointed out that, "Although industry good practice guidance shows that

---

[2] This letter also refers to this rulemaking by the acronym "SCCAP" in quoted material.

[3] "Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act"; 82 FR 4594, January 13, 2017. The 2017 amendments rule was prompted by E.O. 13650, "Improving Chemical Facility Safety and Security "(available at https://obamawhitehouse.archives.gov/the-press-office/2013/08/01/executive-order-improving-chemical-facility-safety-and-security), which directed EPA (and several other Federal agencies) to, among other things, modernize policies, regulations, and standards to enhance safety and security in chemical facilities. Requirements of the 2017 included provisions addressing STAA, third party audits, root-cause incident investigations, as well information disclosure to the public upon request and after accidental releases. Many of these provisions were retained, modified, rescinded, restored, or expanded by subsequent rulemakings in 2019 and in the 2022 Safer Communities rule. The 2017 amendments rule is available in the rulemaking docket at www.regulations.gov as item EPA-HQ-OEM-2015-0725-0635.

[inherently safer] technology is preferable and often the most effect of [sic – should be "effective"] safety precaution in the hierarchy of controls to prevent chemical incidents[,] it is not currently required by EPA's RMP regulation." The transcripts outlining these arguments are in the public docket and were available for public review.[4] In the 2022 Safer Communities proposed rule preamble, EPA discussed the hierarchy of controls as it was proposed in the 2017 amendments rule by proposing that the 2022 rule would "…expand upon these requirements by requiring the owners or operators to consider safer technology and alternative risk management measures that could eliminate or reduce risk from process hazards. In addition to engineering and administrative controls, owners and operators of facilities with Program 3 processes covered under this provision would have to consider the application of the following safer technology measures, in the following order: inherently safer technology (IST) or inherently safer design (ISD), passive safeguards, active safeguards, and procedural safeguards." *Id*. at 53575.

EPA also proposed adding paragraph 40 CFR 68.67(c)(9)(i) "to specify that the analysis include, in the following order, IST or ISD, passive measures, active measures, and procedural measures. The owner or operator may evaluate a combination of risk management measures to reduce risk." *Id*. at 53581. In response to the 2022 Safer Communities proposed rule's comment solicitation on the issue of implementation, EPA received several public comments requesting that EPA require implementation of technically practicable IST/ISD and STAAs. Response to Comments (RTC) at 138 and 140.[5] Based on these public comments, EPA finalized the provisions at § 68.67(c)(9) and § 68.67(h) of the regulation.

The 2024 Safer Communities final rule preamble explains the Agency's position on the implementation mandate stating:

> The Agency acknowledges that, prior to this final rule, EPA has not made implementation of any IST/ISD or any measure identified in a STAA either a preferred option at proposal or an adopted requirement in a final rule. Our prior rulemakings have discussed our policy view of the merits of requiring implementation. … The 2017 amendments rule, the 2019 reconsideration rule, and the 2022 SCCAP proposed rule all had vigorous discussion of the merits of implementing STAA throughout the rulemaking process, and the 2022 SCCAP proposed rule solicited comment on whether implementation should be required. Therefore, sources were on notice that the decision was an open matter and any reliance that we would not adopt an implementation requirement in response to comments and data was not reasonable.

89 Fed. Reg. 17622, 17644 (March 11, 2024).

The 2024 Safer Communities final rule simply adopts a method of implementation consistent with the hierarchy of controls, while providing facilities with "the flexibility to assess and potentially implement IST, implement passive measures, or implement a combination of active and procedural measures to reduce risk associated with a process." *Id*. at 17652. Both the potential for requiring implementation

---

[4] See EPA-HQ-OLEM-2021-0312-0011, available at www.regulations.gov.
[5] EPA. Response to Comments on the 2022 Proposed Rule (August 31, 2022; 87 FR 53556) Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act; Safer Communities by Chemical Accident Prevention. The RTC is available in the rulemaking docket at www.regulations.gov as item EPA-HQ-OLEM-2022-0174-0583.

and the preferential order of STAA measures were available for comment in the 2022 Notice of Proposed Rulemaking (NPRM), especially when one considers the extent to which these issues have been prominent throughout the discussion of STAA. While the precise method for implementing STAA to be consistent with the hierarchy of controls had not been aired (that is, implementing at least one measure per stationary source every five years, with a preference for measures higher on the hierarchy when practicable, rather than implementing all practicable measures regardless of the hierarchy), petitioners cannot reasonably claim that it was impractical for them or other members of the public to raise an objection to this provision because they were unaware that EPA was considering an implementation mandate utilizing the hierarchy of controls. This claim thus fails to meet the criteria for mandatory reconsideration.

Additionally, what EPA ultimately adopted is substantially less burdensome than what commenters recommended, which was to implement all practicable alternatives that could eliminate risks of a catastrophic release. RTC at 287. In fact, a requirement to implement all practicable measures identified in STAA would have been much more costly and burdensome on facilities. EPA considered the impact of requiring implementation of every practicable measure on facilities and finalized the provision to require implementation of at least one passive measure, or an inherently safer technology or design, or a combination of active and procedural measures equivalent to or greater than the risk reduction of a passive measure in response to the concern regarding the burden the implementation mandate would impose on facilities. Objections raised by petitions do not provide substantial support for the argument that the regulation should be revised and are therefore not centrally relevant to the outcome of the 2024 Safer Communities final rule.

  ii. **Petitioners allege that EPA provides an insufficient basis for imposing the costs of the implementation mandate on specific facilities.**

Petitioners argue that the Agency did not provide appropriate justification for imposing the implementation mandate on certain facilities, specifically as it relates to costs incurred. Petitioners state, "The implementation mandate applies to many types of RMP-regulated facilities: chemical, coal, or petroleum manufacturing facilities 'located within one mile of another' such facility; facilities with hydrofluoric acid alkylation ('HF') covered processes; and chemical, coal, or petroleum manufacturing facilities with one RMP-reportable accident since the most recent PHA. But EPA fails to provide a sufficient reasoned basis for imposing massive costs on these specific facilities. Indeed, the Final Rule acknowledges that STAA implementation would account for more than half of the total cost of the RMP amendments – between $169 million and $205 million in annualized costs."

The EPA finds that this claim does not satisfy the requirements of mandatory reconsideration under CAA section 307(d)(7)(B). First, petitioners could have raised an objection during the public comment period because EPA explained the basis for how it selected which facilities should be subject to the STAA provisions in the 2022 Safer Communities proposed rule (which were carried through to the final rule for implementation):

> Multiple factors led EPA to propose focusing the STAA requirement on densely co-located petroleum refining and chemical manufacturing facilities (*i.e.*, facilities with processes in NAICS codes 324 and 325 that are within 1 mile of another facility in those NAICS codes). The distance of 1 mile represents the median distance of facilities with 324 and 325 NAICS processes that have

had accidents in the period from 2016 to 2020 to the nearest facility with a process in these NAICS in 324 or 325. Facilities in these NAICS codes experience more frequent accidental releases. In the period from 2016 to 2020, communities near densely co-located facilities in these NAICS codes have experienced more frequent accidents than communities near other facilities in these NAICS codes and have had more offsite impacts from releases than other communities have experienced...The proximity of densely co-located refining and chemical manufacturing facilities creates a greater risk of an accident at one facility impacting safety at the nearby facility, thereby increasing the potential for a release at the second facility (a "knock-on" release). Communities in areas with such densely co-located petroleum refining and chemical manufacturing facilities face overlapping vulnerability zones and heightened risk of being impacted by an accidental release relative to other communities. The heightened risk of community impacts presented by densely co-located refineries and chemical manufacturers make it reasonable for EPA to propose the 1 mile criterion for additional prevention measures such as STAA.

87 Fed. Reg. at 53577.

EPA thus determined that communities within one mile of multiple refineries and chemical manufacturers face an elevated risk of an accidental release impact simply as a function of the arithmetic. In other words, all other factors being equal, having two or more sources within one mile of each other doubles the likelihood of a nearby accident. This is especially true in the sectors the rule focuses on, the North American Industry Classification System (NAICS) codes of which experience a greater number of accidents than other sectors covered by the Safer Communities rule. While accidental releases, especially worst-case scenarios, are low probability/high consequence events, having two or more nearby facilities raises the odds of such an event for the community. The Safer Communities rule's focus on facilities presenting this elevated risk to nearby communities is therefore reasonable and justified.

EPA also provided extensive discussion regarding the focus of more burdensome requirements on facilities with HF-covered processes in the 2022 Safer Communities proposed rule, including discussions of investigations of potentially catastrophic near-miss incidents at facilities using HF, such as the Husky Refinery in Superior, Wisconsin and Philadelphia Energy Solutions (PES) in Philadelphia, Pennsylvania.[6]

---

[6] The release of HF from the PES facility identified in the 2022 Safer Communities proposed rule was caused by a ruptured pipe elbow at the refinery's HF alkylation unit, allowing propane and HF vapor to escape and create a large vapor cloud around part of the unit. The vapor cloud ignited, causing a large fire and three explosions. Three fragments of a large vessel flew into the air with a 19-ton piece flying across the Schuylkill River and landing on its bank. Two other very large fragments landed on the refinery property. An estimated 5,239 pounds of HF were released during the incident, with 1,968 pounds contained with water spray within the unit and 3,271 pounds released into the atmosphere. A population of approximately 117,300 people lived within one mile of the PES refinery at the time of the incident. EPA identified several social costs of the incident in its final rule RIA, including worker injuries, costs to the city of Philadelphia and regional emergency responders, and the temporary closure of portions of Interstate 76 and Philadelphia's Platt Bridge, among others. According to the facility's most recent RMP submission prior to the incident, a worst-case scenario release of HF could have reached over 7 miles, potentially impacting a population of more than 1 million people and several public receptors, including major highways and railways in both Pennsylvania and New Jersey. Following the incident at PES, the Chemical Safety Board (CSB) issued recommendations to EPA to develop a program prioritizing and emphasizing inspections of HF alkylation units and that EPA revise the RMP program to require a safer technology and alternatives analysis of HF alkylation units to evaluate the practicability of inherently safer technologies. This incident, and others, justify EPA's basis for imposing the

*Id*. at 53576 – 53577. The 2022 Safer Communities proposed rule stated, "EPA is proposing that all HF alkylation processes at petroleum refineries (NAICS 324) conduct a STAA review primarily due to the recent incidents…where HF was nearly released when there were explosions, fires, and other releases that could have triggered releases of HF." *Id*. at 53576.

Further, under "Alternative Options" for STAA, EPA discussed requiring STAA for stationary sources in NAICS codes 324 and 325 as one of the options considered and provided an estimate of the number of facilities potentially impacted. *Id*. at 53579. As outlined in the proposal, an option EPA considered was requiring STAA for stationary sources in NAICS 324 and 325 that have had a reportable accident in the most recent five years, and the Agency invited comment on the options considered. *Id*. The 2022 Safer Communities proposed rule also highlighted that RMP facilities in NAICS 324 and 325 were responsible for a relatively large number of accidents, deaths, injuries and property damage, as well as facilities having two or more accidents. *Id*. at 53578. EPA explicitly stated, "Implementation of safer technology and alternatives by these facilities in the chemical manufacturing and petroleum refining sectors may prevent serious accidental releases in the future." *Id.* EPA also included this subset of facilities under "Alternative Options" for STAA, stating "EPA considered applying STAA requirements to facilities in NAICS 324 and 325 with a reportable accident within the last five years." *Id*. at 53579. The public was therefore on notice that facilities in NAICS 324 and 325 with previous accidents were being considered for STAA implementation. The petition recognizes that implementing STAA measures was raised for comment as a potential, non-preferred strengthening of the proposed primary option. Petition at 4. The 2024 Safer Communities final rule simply applies a more targeted, less burdensome implementation approach to facilities the 2022 Safer Communities proposed rule identified as meriting more focused prevention measures. EPA's justification for imposing the implementation mandate on specific facilities was plainly raised for comment, and the expansion of the targeted facilities beyond densely collocated facilities in NAICS 324 and 325 and facilities in NAICS 324 with HF alkylation units was described among the potential alternatives with sufficient specificity to invite comment. Therefore, this claim fails to meet the criteria for mandatory reconsideration because it fails to provide information that was impracticable to raise during the period for public comment.

As it relates specifically to the cost of the implementation mandate, EPA's basis for finalizing a rule that results in specific facilities incurring costs is described in both the preamble of the 2022 Safer Communities proposed rule and in the Safer Communities proposed rule regulatory impact analysis (proposed rule RIA) through EPA's discussions of the benefits of the STAA provision.[7] The proposed rule RIA and EPA's explanation in the 2022 Safer Communities proposed rule preamble show that a singular focus on cost without discussing benefits is not reasonable. For example, the 2022 Safer Communities proposed rule specifies that the STAA provision was proposed to reduce the risk of serious accidental releases from facilities by requiring the examination of safer technology and designs that could be implemented in lieu of, or in addition to, current technologies. 87 Fed. Reg. at 53575 - 76. In describing the qualitative benefits of the STAA requirements, the proposed rule RIA states:

---

implementation mandate on facilities with covered HF processes. To view the CSB report for this incident, see EPA-HQ-OLEM-2022-0174-0524 available at www.regulations.gov.

[7] EPA. Regulatory Impact Analysis for NPRM "Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act; Safer Communities by Chemical Accident Prevention," published at 87 Fed. Reg 53556 (August 31, 2022). The Safer Communities proposed rule RIA is available in the rulemaking docket at www.regulations.gov as item EPA-HQ-OLEM-2022-0174-0586.

> [t]he STAA should result in identification of potential process changes that, if implemented, result in owners or operators using less hazardous substances, minimizing the amount of regulated substances present in a process, moderating process conditions, or reducing process complexity. Such changes help reduce the prevalence of higher risk processes and thereby prevent accidents by either eliminating the possibility of an accidental release entirely, by making a process more fault-tolerant, such that a minor process upset, or equipment malfunction is less likely to result in a serious accidental release, and by making releases that may occur, less severe.

Proposed rule RIA at 56. As further discussed in the proposed rule RIA, the accident prevention benefits of the proposed rule with the STAA provision were anticipated to:

> …include reductions in the numbers of fatalities and injuries both onsite and offsite and residents evacuated or otherwise inconvenienced by sheltering in place; reductions in the damage caused to property onsite and offsite of the facility including damages to product, equipment, and buildings; reductions in damages to the environment and ecosystems; and reductions in resources diverted to extinguish fires and clean-up affected areas.

Proposed rule RIA at 53. These potential benefits of accident reduction detailed in the RIA are also discussed in the 2022 Safer Communities proposed rule preamble and thus were available for public comment. 87 Fed. Reg. at 53561-62. Specifically, Table 3 in the 2022 Safer Communities proposed rule preamble summarizes the types of damages from accidents that can be monetized, while Table 4 presents the non-monetized social benefits of accident reduction. *Id*. Non-monetized benefits discussed in Table 4 are significant. The final rule RIA[8] discusses studies in the record that corroborate the magnitude of one type of benefit identified in Table 4, reduced property value impacts.

Further, EPA discussed in the proposal its belief that sources would adopt ISTs and other measures identified in a STAA when such measures were "practicable technically and economically and when the risk reduction is significant even in the absence of a mandate." *Id*. at 53580. In so doing, the Agency solicited comment on whether sources should implement technically practicable IST/ISD and STAAs. *Id*. EPA also discussed that "an owner or operator may choose to not implement a safer technology or design identified on account of its cost" and proposed that "the evaluation of practicability be first based on technological, environmental, legal, and social factors, with economic considerations evaluated last." *Id*. at 53581. Therefore, the NPRM identified the cost of implementing STAA measures as important to EPA's thinking and practicable STAAs as being the ones the Agency thought most likely to be implemented. While the precise option ultimately adopted was not discussed in the NPRM with a specific cost estimate, the NPRM put the public on notice that cost and practicability would be factors in our ultimate decision on implementation. It should also be noted that the 2024 Safer Communities final rule also allows for consideration of whether a STAA measure is cost-prohibitive when assessing its practicability. RTC at 97.

---

[8] EPA. Regulatory Impact Analysis for "Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act; Safer Communities by Chemical Accident Prevention," published at 89 Fed. Reg 17622 (March 11, 2024). The Safer Communities final rule RIA is available in the rulemaking docket at www.regulations.gov as item EPA-HQ-OLEM-2022-0174-0587.

Additionally, in the Safer Communities proposed rule RIA, EPA provided the cost of "reference" STAA projects in order to inform the estimated costs associated with the STAA practicability assessment. Proposed rule RIA at 36 – 38. The reference projects relied on in the proposed rule RIA were based in part on public comments received on the 2017 amendments rule RIA, including public comments from the American Water Works Association (AWWA) and AFPM. In the 2022 Safer Communities proposed rule, public commenters had the opportunity to assess the reasonableness of these reference STAA projects. However, no public comments provided input on the costs of the reference STAA projects. The reference STAA project costs included in the proposed rule RIA, along with additional reference projects identified by EPA for the 2024 Safer Communities final rule RIA, were ultimately used to calculate the STAA implementation costs in the Safer Communities final rule RIA.

Members of the public, including members of the RMP Coalition, recognized that costs would factor into EPA's ultimate decision on STAA implementation. *See e.g.,* Comment from the NACD, EPA-HQ-OLEM-2022-0174-0234. In fact, EPA received several public comments in response to the 2022 Safer Communities proposed rule concerning costs for implementing STAA measures. RTC at 141 - 142. EPA responded to these concerns in the RTC document for the 2024 Safer Communities final rule, stating in part, "In response to comments concerning costs for implementing STAA measures, EPA believes there is an overemphasis on initial costs leading to less consideration of safer, reliable methods to reduce process risks. CCPS' 2019, 'Guidelines for Inherently Safer Chemical Processes, A Life Cycle Approach,' discusses the tradeoff of initial and operating costs of implementing different STAA measures. CCPS indicates that while inherently safer and passive measures do tend to have higher initial capital costs, operating costs are usually lower than those for the other measures. For active measures as compared to inherently safer and passive measures, reliability is typically lower, and complexity is greater. Operating costs are also actually likely to be the greatest for active solutions. While procedural measures are most often tempting solutions due to their initial very low capital cost and typically lower complexity, they are often also the least reliable and should be considered only after other solutions have been explored." *Id.* at 142 - 143.

EPA therefore finds that the petitioners' claim does not satisfy the requirements of mandatory reconsideration under CAA section 307(d)(7)(B) because the STAA implementation cost issue was raised by the NPRM.

Second, petitioners' objections that EPA failed to provide a sufficient reasoned basis for imposing significant costs on specific facilities also do not warrant mandatory reconsideration under CAA section 307(d)(7)(B) because the objection is not of central relevance to the outcome of the 2024 Safer Communities final rule—*i.e.*, the objection does not provide substantial support for the argument that the regulation should be revised. As mentioned previously, as it relates to accidental releases, especially worst-case scenarios, a singular focus on costs alone, without discussing the benefits of STAA implementation, is not reasonable.

In order to provide further justification that EPA's final STAA implementation requirements were reasonable and justified, results from two studies published in 2023 were discussed in the Safer Communities final rule RIA.[9] While these studies may have been published after the 2022 Safer

---

[9] See EPA-HQ-OLEM-2022-0174-0587 available at www.regulations.gov.

Communities proposed rule, they corroborate EPA's argument in the 2022 Safer Communities proposed rule that benefits that were not monetized in the 2022 Safer Communities proposed rule could be substantial and support the reasonableness of the rule. The studies corroborate EPA's position in the 2022 Safer Communities proposed rule on which EPA sought comment, which is that preventing RMP facility accidents has an impact on residential property values.[10,11] Specifically, the final rule RIA stated:

> Two recent hedonic property value analyses have examined the impact of RMP facility accidents on residential property values (Guignet et al. 2023a, b). Using a difference in differences estimation approach, Guignet et al. (2023b) studied nationwide data on RMP facility accidents and residential transactions between 2004 and 2019 that occurred within 5.75 km (3.57 miles) of an accident. The analysis found that accidents with only onsite impacts reduced nearby property values between zero and two percent. However, accidents with impacts that occurred offsite, including fatalities, hospitalizations, people in need of medical treatment, evacuations, sheltering in place events, and/or property and environmental damage, reduced home values by two to three percent. The lower values persisted for about 10 to 12 years on average. The paper estimates an average loss of $5,350 per home in 2021 year values. Aggregating across the communities near the 661 facilities that experienced an offsite impact accident in their data, Guignet et al. (2023b) calculate a total $39.5 billion loss.

> In the second paper, Guignet et al. (2023a) analyzed RMP facilities and accidents in a smaller geographic area – the three states of Michigan, Ohio, and Pennsylvania – from 2004 through 2014. The analysis used alternative difference-in-differences and triple differences approaches that allowed comparison between homes before and after an accident, near an accident versus farther away, and homes near facilities with an accident versus near facilities with no accidents. The study concluded that accidents with offsite impacts caused a five to eight percent decrease in home values within 5 km (3.1 miles) of a facility accident. Both studies concluded that nearby homeowners experienced significant losses following an accident with offsite impacts. Thus, provisions that reduce the risks and expected magnitudes of such accidents will protect nearby property values. Guignet et al. (2023a) found that homes located near facilities regardless of whether an accident has occurred are already valued significantly lower than homes farther away. Accidents can further depress property values and exacerbate disparities in home values. This is an important distributional concern considering that residential property is a key source of wealth to many households.

Final Rule RIA at 88 - 89.

Elsewhere, the final rule RIA discussed productivity losses at firms that have experienced an accident. Such losses are a separate additive category in relation to declines in *offsite* property values. The Final Rule RIA stated:

---

[10] Guignet, Dennis, Robin R. Jenkins, James Belke, and Henry Mason. 2023a. The property value impacts of industrial chemical accidents. *Journal of Environmental Economics and Management*. 120 (2023) 102839.

[11] Guignet, Dennis, Robin R. Jenkins, Christoph Nolte, and James Belke. 2023b. The External Costs of industrial Chemical Accidents: A Nationwide Property Value Study. *Journal of Housing Economics*. 62 (2023) 101954.

As for productivity losses, a Marsh 2016 report observed that business interruption insurance claims in the energy sector were typically 2 to 3 times a facility's property loss value.[12] Applying such a multiplier to the annual average onsite property damages [to facilities] of $455 million over the 5-year period of 2016 to 2020 from RMP-related accidents included in this analysis, the annual average productivity losses would be $909 million (using a factor of 2) to $1.364 billion (using a factor of 3).

Final Rule RIA at 92.

The 2024 Safer Communities final rule estimated the baseline annual cost of accidents at RMP facilities as $540 million. This value was calculated without accounting for the estimated impacts on property values provided by the two Guignet studies.[13] 89 Fed. Reg. at 17624 n.1. Instead, EPA relied on these studies to corroborate a point made in the proposal, which was that the potential benefits of the rule are significant, and may well outweigh its estimated costs. 87 Fed. Reg. at 57562. EPA relied on the corroborating studies that supported the same prevention benefits described in the 2022 Safer Communities proposed rule and proposed rule RIA as part of its reasoned basis for requiring implementation of measures identified through a STAA (*See e.g.*, Final rule RIA at 78 and 81). Costs of STAA projects were adequately noticed, potential benefits identified for comment, facilities for focused accidental release highlighted for comment, and implementation discussed as an option. The cost issue raised in the petition only partially addresses factors EPA considered in determining the reasonableness of the 2024 Safer Communities final rule. Therefore, after reviewing petitioners' claim, EPA does not believe that the burden of the 2024 Safer Communities final rule's cost alone provides substantial support for the rule to be revised, and therefore, the claim is not of central relevance to the outcome of its final rule decision.

      iii.    **Petitioners allege that the hierarchy of measures that facilities must implement is unclear.**

Petitioners claim that the requirements of the implementation mandate are "arbitrary and unjustified." Petitioners also allege that the process for implementing the hierarchy of controls is not clear. Petitioners state, "How this hierarchy will work in practice, however, is far from clear. Suppose a facility's STAA identifies a passive measure that is extremely costly and provides only moderate risk reduction. The Final Rule's implementation mandate could be read to require a facility to adopt that costly passive measure before adopting a far less costly procedural measure that is nearly equivalent in risk reduction. This could occur so long as the passive measure was 'practicable' under the Final Rule and therefore preferred."

EPA disagrees that this information was not available for public comment for the 2024 Safer Communities final rule because the 2022 Safer Communities proposed rule preamble included a discussion of the hierarchy of controls which is consistent with EPA's final rule provisions. In the 2022

---

[12] Marsh JLT Specialty, "The 100 Largest Losses 1974-2015: Large property damage losses in the hydrocarbon industry," 24th Edition, March 2016. Accessed from https://www.marsh.com/uk/industries/energy-and-power/insights/100-largest-losses.html. Marsh provides estimates of large property damage losses in the hydrocarbon industry and in a few cases, business loss costs. See EPA-HQ-OLEM-2022-0174-0497 available at www.regulations.gov.

[13] Similarly, the 2024 Safer Communities final rule estimate of $540 million baseline annual accident costs did not account for facility productivity losses.

Safer Communities proposed rule, EPA explicitly proposed expanding upon the existing requirement for facilities with Program 3 processes to address hazards using engineering and administrative controls by addressing inherent safety. The 2022 Safer Communities proposed rule states, "Program 3 processes covered under this provision would have to consider the application of the following safer technology measures, in the following order: inherently safer technology (IST) or inherently safer design (ISD), passive safeguards, active safeguards, and procedural safeguards." 87 Fed. Reg. 53575. EPA's intent for the 2024 Safer Communities final rule was to apply and rely on the hierarchy of controls in the STAA provision as outlined in the 2022 Safer Communities proposed rule.[14]

The 2022 Safer Communities proposed rule included a practicability assessment, in addition to the STAA evaluation, and included a definition of "practicability" that made clear the allowable factors to consider in assessing which measures to implement at a facility. In the 2022 Safer Communities proposed rule, EPA said "EPA is also proposing to include a more comprehensive practicability assessment, in addition to the STAA evaluation requirements as part of the PHA. As part of this analysis, owners and operators would be required to identify, evaluate, and document the practicability of implementing inherent safety measures, including documenting the practicability of publicly available safer alternatives." 87 Fed. Reg. 53575. The 2022 Safer Communities proposed rule made clear that economic considerations were a valid component to be considered in choosing which measures to implement. Specifically, the proposed rule defined "practicability" as "the capability of being successfully accomplished within a reasonable time, accounting for environmental, legal, social, technological and economic factors. Environmental factors would include consideration of potential transferred risks for new risk reduction measures." 87 Fed. Reg. at 53608. The 2022 Safer Communities proposed rule clarified that "[a]lthough an owner or operator may choose not to implement a safer technology or design identified on account of its cost, EPA is proposing that the evaluation of practicability be first based on technological, environmental, legal, and social factors, with economic considerations evaluated last." 87 Fed. Reg. at 53581.

EPA received several public comments in response to the 2022 Safer Communities proposed rule regarding the implementation of inherently safer technologies. RTC at 141 - 142. In response to these comments, EPA clarified that the rule "allows a source to adopt layering active and procedural measures to achieve the equivalent risk reduction a passive measure would achieve and does not adopt a requirement for an IST/ISD at each hazard point. The Agency retains substantial flexibility for owners and operators to select among passive measures they deem appropriate for their stationary sources." *Id.* The 2024 Safer Communities final rule states that facility owners and operators will have flexibility to "assess and potentially implement IST, implement passive measures, or implement a combination of active and procedural measures to reduce risk associated with a process." 89 Fed. Reg. at 17652. Additionally, in the 2024 Safer Communities final rule, EPA retained the definition of "practicability" as proposed without revision and specified that "EPA believes that it is appropriate for a

---

[14] Additionally, inherent in the common understanding of a hierarchy of controls is a preference for higher-ranked control options. *See*, *e.g.*, CCPS. 2009, Inherently Safer Chemical Processes: A Life Cycle Approach, 2nd ed., American Institute of Chemical Engineers, CCPS New York, Wiley; 87 Fed. Reg. at 53575; 81 Fed. Reg. at 13663; 82 Fed. Reg. at 4638; EPA Response to Comments on the 2016 Proposed Rule Amending EPA's Risk Management Program Regulations (March 14, 2016; 81 FR 13637), at 113 – 114 and 141. Petitioners' objection to the clarity of the hierarchy of controls in the 2024 Safer Communities final rule does not provide substantial support for the argument that the regulation should be revised, and therefore is also not of central relevance to the 2024 Safer Communities final rule.

facility to consider the five practicability factors (i.e., economic, environmental, legal, social and technological) for evaluating the appropriateness of implementing for potential IST measures because some IST can involve significant costs or involve impacts that go beyond the facility." 89 Fed. Reg. at 17650. Therefore, given that EPA explained the hierarchy of controls in the 2022 Safer Communities proposed rule and allowable factors to consider when choosing which measures to implement, subject to public comment, and EPA addressed it in the RTC and preamble to the 2024 Safer Communities final rule, EPA finds that it was not impracticable to have raised objections about implementing practicable measures consistently with the hierarchy of controls during the comment period.[15] Therefore, these claims do not satisfy the requirements of mandatory reconsideration under CAA section 307(d)(7)(B).

      iv.    **Petitioners allege that the Agency did not resolve many additional aspects of the implementation mandate that are unclear, because stakeholders did not have the chance to comment.**

Petitioners claim that the requirements of the implementation mandate are unclear because they were not raised for public comment. Petitioners argue that the 2024 Safer Communities final rule "appears to assume that a facility does not already have existing passive measures" and does not address how the implementation mandate applies to facilities with multiple process hazard analyses (PHAs). Petitioners argue that if existing passive measures are already in place, "the Final Rule would be requiring additional, perhaps duplicative or redundant measures for an already safe process." EPA disagrees with this claim. The 2022 Safer Communities proposed rule preamble acknowledged that then-current PHA requirements include some aspects of the hierarchy of controls analysis. EPA also noted the discussion in the 2017 amendments proposed rule, which pointed out that an evaluation of engineering and administrative controls has been required at Program 3 facilities since 1996, leaving implementation up to the owner or operator. 87 Fed. Reg. at 53575. EPA received several comments in opposition to the proposed STAA provisions, including comments from Petitioners that "Analysis of passive measures, active measures, and procedural measures already occurs as part of the PHA."[16] In response to these and other comments, EPA acknowledged in the RTC that the requirement to assess control of hazards has been a PHA requirement since the inception of the rule. RTC at 90. EPA acknowledged that "some passive (or equivalent) safeguards to control hazards are likely already in place." *Id.* Further, EPA responded that "Facilities that have already implemented passive measures or an equivalent level of risk reduction should document their implementation in their next PHA, determine whether there is additional information that should be considered in their STAA, and

---

[15] The issue raised by petitioners poses a hypothetical of an extremely costly but practicable passive measure that provides moderate risk reduction and whether it would have to be implemented under the rule when a set of less costly active and procedural measures identified in the STAA would provide nearly equivalent risk reduction at a much lower cost. In this hypothetical, the petition conjectures a scenario in which the costs do not render the passive measure project impracticable (the rule allows for consideration of cost when assessing practicability). By describing the alternate project as "nearly equivalent" rather than equivalent, the hypothetical assumes the alternate project provides demonstrably inferior risk reduction (the rule does not require strictly quantified risk estimations, so "nearly equivalent" concedes the alternative provides inferior risk reduction that is apparent). The rule provides the owner or operator the flexibility to choose one among the practicable passive measures at the stationary source rather than forcing implementation of every practicable measure, so in order for the source to be compelled to choose among only the two options in the hypothetical, there would have to be no other practicable risk-reducing passive measures at the stationary source. Assuming all the conditions are met for the hypothetical, then the rule does require the selection of the demonstrably superior risk-reducing measure that is not cost prohibitive and otherwise is practicable.

[16] See EPA-HQ-OLEM-2022-0174-0233, available at [www.regulations.gov](http://www.regulations.gov).

continue to consider additional passive (or equivalent) measures during subsequent PHA re-validation cycles." *Id*. This response was reiterated in the 2024 Safer Communities final rule preamble. 89 Fed. Reg. at 17652.

Petitioners claim that the 2024 Safer Communities final rule is not clear in addressing how facilities that conduct multiple PHAs are to comply with the implementation requirement. Petitioners argue that "the rule is unclear as to whether a mitigation measure is required every five years (a PHA cycle), or whether the new regulation requires a mitigation measure every time a PHA is conducted at a covered source. Likewise, if mitigation measures are required because a process unit had a reportable event, the Final Rule does not specify whether the mitigation measure must be implemented at that same process unit." EPA sought comment on whether the Agency should require implementation of technically practicable IST/ISD and STAAs in addition to the requirement to include evaluation of STAA as a part of the PHA in the 2022 Safer Communities proposed rule preamble. 87 Fed. Reg. at 53580. In the proposed changes to 40 CFR 68.67 described in the 2022 Safer Communities proposed rule preamble, EPA provided that "[t]he PHA must be updated and revalidated at least every 5 years in accordance with paragraph 40 CFR 68.67(f)." 87 Fed. Reg. 53581. This paragraph requires that the PHA shall be updated and revalidated at least every five years after the initial PHA, which is to be performed on processes covered by Part 68. The 2022 Safer Communities proposed rule also provided compliance dates for the proposed STAA provisions, with the compliance date being three years after the effective date of the 2024 Safer Communities final rule (May 10, 2024), which is consistent with the last sentence of CAA section 112(r)(7)(B)(i). In the 2024 Safer Communities final rule preamble, EPA provided guidance on the compliance date for the STAA evaluation and IST/ISD practicability assessment, as well as the STAA safeguard implementation provision. 89 Fed. Reg. at 17681. EPA also asserted that "implementation (of at least one passive measure, or an inherently safer measure, or an inherently safer technology or design, or a combination of active and procedural measures equivalent to or greater than the risk reduction of a passive measure) is required each PHA cycle." *Id*. "Each PHA cycle" is not the same as "each PHA." The reference is to the five-year PHA cycle. Only one STAA measure needs to be undertaken at the stationary source each cycle regardless of how many PHAs are performed over the five-year period.

Since the implementation mandate was proposed as an alternate option in the NPRM, sources were on notice, and could have raised issues related to facilities with multiple processes requiring PHAs in the period for public comment. Therefore, petitioners' claims do not meet the requirement for mandatory reconsideration.

> **v.    Petitioners allege that the final rule imposes a definition of which measures are "practicable" that violates CAA section 112.**

Petitioners claim that the 2024 Safer Communities final rule imposes a definition of which measures are "practicable" that violates CAA section 112. Petitioners argue that by stating, "a claim that implementation is not practicable shall not be based solely on evidence of reduced profits or increased costs," the Agency is going back on its stance that "cost is a valid consideration for practicability." Petitioners state that "the term 'practicable' inherently includes at least some consideration of whether a course of action is financially 'feasible' or economically justified." EPA disagrees with petitioners' claim that EPA is reversing its position on what is "practicable." In the 2022 Safer Communities proposed rule, EPA acknowledged cost and economics would be part of a facility's decision to adopt a

14

safer technology. 87 Fed. Reg. at 53580. EPA also discussed that what is "practicable" may change over time due to changes in cost and technology. *Id* at 53581. In stating that owners or operators should not rely *solely* on evidence of reduced profits or increased costs to determine practicability, EPA has maintained its stance that cost is a valid consideration. The 2022 Safer Communities proposed rule preamble stated, "EPA is proposing to define the term 'practicability' as the capability of being successfully accomplished within a reasonable time, accounting for technological, environmental, legal, social, and economic factors." 87 Fed. Reg. at 53581. This definition did not change in the 2024 Safer Communities final rule. Moreover, the 2024 Safer Communities final rule preamble states "to the extent that particular measures are cost-prohibitive, the rule allows for that to be a factor in assessing whether a measure is practicable." 89 Fed. Reg. at 17649.

The petition further argues that EPA has not met the standard of *FCC v. Fox Televisions Stations, Inc.*, 556 U.S. 502, 515 (2009), which requires an Agency to have "good reasons" to change the status quo of an adopted rule that the Agency has concluded is beneficial. EPA disagrees, as the Agency has maintained in the 2024 Safer Communities final rule that facilities may consider cost when determining whether the implementation of IST/ISD is "practicable." In the RTC, EPA clarified its position, stating:

> The relevant statutory phrase describing EPA's authority to regulate under CAA section 112(r)(7)(B)(i), authorizes 'reasonable regulations . . . to provide, to the greatest extent practicable,'[17] for the prevention and detection of and response to accidental releases of substances listed in 40 CFR 68.130. EPA interprets the term 'practicable' in this context to include concepts such as cost-effectiveness of the regulatory and implementation approach, as well as the availability of relevant technical expertise and resources to the implementing and enforcement agencies and the owners and operators who must comply with the rule.

RTC at 305. Petitioners' claims do not meet the mandatory reconsideration criteria because the definition of practicability was plainly raised for public comment in the 2022 Safer Communities proposed rule.

### vi. Petitioners allege that EPA lacks the authority to mandate adoption of IST/ISD.

---

[17] The petition cites the language of CAA section 112(r)(7)(B)(i) as a limitation on the meaning of "practicable" in that the regulatory terms must be reasonable as well, and claims the rule is unreasonable because it "effectively prohibits facilities from conducting a common-sense assessment of whether a given measure is cost justified." Petition at 6. As noted above, the rule allows for rejecting measures that are cost-prohibitive and recognizes that "practicable" includes the concept of "cost-effectiveness." EPA acknowledged that the rule must be both "reasonable" and "practicable" at all points in the rulemaking. *See, e.g.*, 89 Fed. Reg. at 17632-33 (discussion of how the final rule gives effect to both terms). The petition attempts to bolster its argument about economic considerations by citing to language from elsewhere in CAA section 112, specifically with a selective quote from CAA section 112(h)(2)(B): "Section 112 expressly contemplates that something could be 'not practicable due to . . . economic limitations.'" The quoted provision addresses when a work practice or non-numeric emission limitation is allowed under another program under section 112, the National Emissions Standards for Hazardous Air Pollutants (NESHAP). The NESHAP program and the CAA section 112(r) program regulate different types of pollutants and different emissions. *Compare* CAA section 112(a) (definitions for section 112 "except for subsection (r)") *with* CAA section 112(r)(2) (definitions applicable to section 112(r)); CAA section 112(b) (hazardous air pollutant list for NESHAPs) *with* CAA section 112(r)(3) & (4) (authority for RMP list at 40 CFR 68.130). While both the NESHAP program and the RMP program are in section 112, the programs are distinct. That the NESHAP provisions may use a term one way does not establish how it should apply to the RMP rule. We also note that the ellipsis in the quote above omits "technical and." Thus, were section 112(h)(2)(B) relevant to the authority under section 112(r)(7)(B)(i), it suggests that a matter must be both technically and economically infeasible, and not be simply not justified on costs.

**Petitioners allege that the authority to mandate adoption of IST/ISD for all processes presents a major question that would require clear congressional authorization.**

EPA is addressing the two related objections, vi and vii., together. Petitioners argue that EPA does not have the authority to mandate the adoption of IST/ISD. Petitioners make several claims regarding EPA's authority to adopt the implementation mandate, including:

- "EPA claimed its authority to adopt the implementation mandate based on a legal rationale that appears nowhere in the Proposed Rule."
- "Subparagraph (B) of Section 112(r)(7) covers only 'the use, operation, repair, replacement, and maintenance of equipment to monitor, detect, inspect, and control' accidental releases. Nothing in that language suggests that EPA may require facilities to mothball existing technologies and adopt wholly new technologies or processes... subparagraph (A) is plainly aimed at 'design . . . requirements' for *new* processes; it cannot be fairly read to permit EPA to require that all facilities' existing processes be thrown out based on new process designs."
- "The authority to impose a mandate to adopt IST/ISD for all processes, however, presents a 'major question' that would require 'clear congressional authorization'."
- "Congress's 'consistent judgment' against empowering EPA to mandate STAA undercuts the Agency's claim to congressional authorization."

These claims do not meet the mandatory reconsideration criteria under section 307(d)(7)(B) because they fail to provide information that was impracticable to raise during the public comment period. As described in previous sections, EPA clearly raised the implementation mandate for public comment in the 2022 Safer Communities proposed rule (87 Fed. Reg. 53580). To accompany those final provisions, EPA also outlined Congress's grant of authority to EPA in order to establish chemical accident prevention rules under subparagraphs (A) and (B) of CAA section 112(r)(7) (87 Fed. Reg. 53563 – 53564). Generally, the 2022 Safer Communities proposed rule explains that the Agency used the same CAA section 112(r)(7) authority to issue the Safer Communities proposed rule that it used when issuing the 1996 RMP rule (61 FR 31668; June 20, 1996), the 2017 amendments rule (82 FR 4594; January 13, 2017), and the 2019 reconsideration rule (84 FR 69834; December 19, 2019).[18] *See Id.* at 53564. Specifically, STAA, which includes IST/ISD, is identified in the Safer Communities proposal as a prevention program authorized by CAA 112(r)(7)(B)(i) as one of several measures used to address prevention and detection of accidental releases. *Id.* EPA also cited to CAA section 112(r)(7)(A) for authority for STAA. *See id. n.13.* Therefore, EPA's claim of authority for the STAA provisions was apparent in the 2022 Safer Communities proposed rule, and the petitioners, as part of the public, could have raised their concerns about EPA's lack of authority during the comment period.

EPA reiterated in the 2024 Safer Communities final rule preamble that both subparagraphs (A) and (B) authorize requiring implementation of safer technologies. 89 Fed. Reg. 17644. The 2024 Safer Communities final rule also pointed to the preambles of the 2017 amendments rule, the 2019 reconsideration rule, and the 2022 Safer Communities proposed rules which "all had vigorous discussion of the merits of implementing STAA throughout the rulemaking process." *Id.* On that point, the 2024 Safer Communities final rule states, "Our prior rulemakings have discussed our policy view of the merits of requiring implementation. Our prior decisions have not questioned what we view to be

---

[18] The 2019 reconsideration rule is available in the rulemaking docket at www.regulations.gov as item EPA-HQ-OEM-2015-0725-2002.

clear on the face of the statute: that the CAA authorizes EPA to require implementation of IST/ISD and other STAA measures." *Id.* Therefore, if the commenters wanted additional justification beyond what was properly provided in our 2022 Safer Communities proposal, they could have also referred to the additional justifications in the previous rulemaking EPA cited. For example, the final rule preamble for the 2017 amendments rule, which EPA referred to in the 2022 Safer Communities proposal, states:

> Both subparagraphs (A) and (B) of CAA section 112(r)(7) authorize STAA and IST in particular. EPA cited all of paragraph (7) as authority for ''[e]ach of the portions of the Risk Management Program rule we propose to modify.'' 81 FR 13646, March 14, 2016. [Footnote 63: We note that our more extensive discussion of authority for the RMP rule provided in the 1993 proposal focused on CAA 112(r)(7)(B)(i) and (ii), 58 FR 54191–93 (October 20, 1993), ...] The authority section for 40 CFR part 68 references CAA section 112(r) and is not limited to particular paragraphs and subparagraphs. ... [W]e also view that our authority to require STAA assessments or an IST review is consistent with subparagraph (B). Under subparagraph (B), EPA has broad authority to develop ''reasonable regulations . . . for the prevention of accidental releases.''

The 2017 amendments rule, as referenced in the 2022 Safer Communities proposal, further indicated that support for IST can be found in both the Conference Report accompanying the 1990 CAA Amendments and the Senate Report explaining the provisions of the Senate bill. Specifically, the 2017 preamble stated:

> In discussing the ''Hazard Assessments'' required by section 112(r)(7)(B), the Conference Report specifies that such assessments ''shall include . . . a review of the efficacy of various release prevention and control measures, including process changes or substitution of materials.'' [Footnote omitted] Conference Report at 340–41. The STAA analysis is such a review. [Footnote omitted] The Senate Report identifies as ''release prevention measures'' many of the techniques that are now known as IST—substitution of less hazardous materials, reduction in the severity of the conditions of processing and complexity of the process, and decreasing volumes of chemicals in storage. [Footnote omitted] Senate Report at 242.

82 Fed. Reg. 4594, 4630—4631 (Jan. 13, 2017). EPA therefore finds that its statutory authority for the STAA provisions were sufficiently outlined for public comment not only in 2022 Safer Communities proposal itself, but also taken in tandem with cross references to other RMP rule preambles EPA cited to in the proposal.

Further, EPA received public comments in response to the 2022 Safer Communities proposed rule's explanation of authority to require STAA, including public comments from members of the RMP Coalition. RTC at 94. EPA provided an extensive response in the RTC, mirroring similar discussions included in EPA's prior rulemakings discussed above, stating:

> The Agency disagrees with the comments that the CAA does not authorize the STAA provisions of this final rule. Both paragraphs (A) and (B) of CAA section 112(r)(7) authorize STAA and IST in particular. EPA cited all of section 112(r)(7) as authority for "[e]ach of the portions of the Risk Management Program rule we propose to modify" (81 FR 13646; March 14, 2016). The authority

section for 40 CFR part 68 references CAA section 112(r) and is not limited to particular paragraphs. The proposed rule also noted that paragraph 112(r)(7)(A) had been invoked in the rulemaking petition on IST and is an express grant of authority for regulation of design and operations. The statute explicitly provides the Administrator with the authority to promulgate "design, equipment, work practice, and operational requirements' in CAA section 112(r)(7)(A), as well as requirements for 'preventing accidental releases of regulated substances, including safety precautions and maintenance" in CAA section 112(r)(7)(B)(ii)(II). The regulation promulgated in this final rule simply imposes standards on continuing safe operations and equipment. Furthermore, the regulations required by CAA section 112(r)(7)(B)(i), "shall cover the use, operation, repair, replacement, and maintenance of equipment to monitor, detect, inspect, and control" accidental releases of regulated substances as appropriate (emphasis added). Terms such as "use" and "operation" necessarily allow EPA to address ongoing activities and not simply the pre-construction phase, and "replacement" of "equipment" to "control" releases authorizes EPA to require upgrades to release prevention measure such as practicable passive control measures...the Conference Report and the Senate Report provide ample support for requiring implementation of process and control measures to lessen the likelihood and impact of accidental releases.

Therefore, EPA provided sufficient notice that the Agency contemplated action under any authority under CAA section 112(r)(7). Nevertheless, EPA also views its authority to require STAA assessments or an IST review, or implementation of safeguards to reduce risk as being consistent with paragraph 112(r)(7)(B). Under paragraph (B)(i), EPA has authority to develop 'reasonable regulations . . . for the prevention of accidental releases.' The reduction in severity of conditions in a process plainly impacts the accidental release conditions and thus the modeling called for in section 112(r)(7)(B)(ii)(I). Moreover, section 112(r)(7)(B)(ii)(II) specifically mentions that prevention programs in risk management plans shall provide for 'safety precautions;' STAA measures are a type of safety precaution. Finally, as noted in the preamble, the Conference Report for the 1990 CAAA and the Senate Report both demonstrate that Congress intended the regulations to prioritize STAA as a prevention measure.

*Id.* at 94 – 95.

EPA therefore finds that the petitioners' claim regarding its authority to require IST/ISD does not satisfy the requirements of mandatory reconsideration under CAA section 307(d)(7)(B) because EPA's authority to require STAA implementation was raised in the NPRM.

Finally, EPA notes that the issue of an IST/ISD mandate is premature, and thus, so is petitioners concern of an IST/ISD mandate being a "major question." The rule does not *mandate* IST/ISD at all, not even on new processes that the petition acknowledges fits within "design" regulation under CAA 112(r)(7)(A). Petition at 6. Rather, the rule *allows for the adoption* of an IST/ISD in lieu of a passive measure. 40 CFR 68.67(h). Therefore, the petition is not actually arguing that the 2024 Safer Communities final rule requirements (implementation of a practicable passive measure or its equivalent, or an active measure if there is no practicable passive measure, or a procedural measure if there is no practicable active measure) is beyond EPA's authority under CAA section 112(r)(7). While the petition conjectures massive costs associated with a hypothetical rule that contains an IST/ISD mandate in order to raise the prospect of a "major question" (an issue that could have been raised in comments), EPA's approach to

CAA section 112(r)(7) has weighed the burden of potential regulations with their benefits and has refrained from claiming authority to impose disproportionate burdens.

Concluding Remarks on STAA

EPA maintains that the STAA provisions required by the 2024 Safer Communities final rule should decrease the accident risks posed by facilities that meet the three conditions for the STAA practicability and implementation requirements. These provisions help address recommendations made by the CSB to EPA as a result of accidents that have occurred at RMP facilities over the last several years.[19] One recent recommendation was to "update the Risk Management Program (RMP) rule by expanding the requirements of 40 CFR Part 68 to include an evaluation of the need for remote isolation devices for major process equipment that can be remotely activated from a safe location or automatically activated during a release."[20] The CSB study identified numerous incidents that resulted in heightened consequences following an accidental release due to the lack of effective remote isolation equipment. CSB stated, "These incidents resulted in serious injuries, fatalities, environmental contamination, and severe damage to facilities." CSB 2024. EPA maintains that this type of evaluation reflects ongoing developments in the field, therefore remote isolation equipment typically would be assessed and potentially implemented when STAAs are performed periodically as required by the rule. *See* 40 CFR 68.67(c)(9) (analysis) and 67.68(h)(implementation). The new requirements are designed to eliminate or reduce risk from process hazards, such as hazards mitigated by the use of remote isolation devices.

In sum, the issues of a requirement to perform a STAA and, for a subgroup, to document a practicability analysis and to implement a practicable measure identified in the STAA were no mystery for the RMP Coalition nor were the members deprived of a meaningful opportunity to comment on these issues. Critical terms associated with STAA, including IST, passive measures, and practicability have stayed

---

[19] For example, the 2019 explosion and fire at the TPC Group (TPC) in Port Neches, Texas reported the largest number of persons ever evacuated (50,000 people) as a result of an RMP-reportable incident. The accident also caused $153 million in offsite property damage, according to the CSB incident investigation report, available at www.regulations.gov as item EPA-HQ-OLEM-2022-0174-0552. This facility was highlighted as an example in the preamble to the 2024 Safer Communities final rule (89 Fed. Reg. at 17634), as it had not been recently inspected and was not prioritized for an inspection, since TPC had no recent prior RMP accidental releases and was not otherwise due for inspection under EPA's routine oversight plan. Additionally, CSB issued recommendations to EPA in the wake of the Tesoro Anacortes Refinery fatal explosion and fire in 2010 advising EPA to require the documented use of inherently safer systems analysis and the hierarchy of controls to the greatest extent feasible when facilities are establishing safeguards for identified process hazards and develop related guidance. The CSB investigation report is available at https://www.csb.gov/assets/1/7/tesoro_anacortes_2014-may-01.pdf. More recently, the Honeywell International Fluorine Products facility in Geismar, Louisiana has experienced a number RMP-reportable accidents involving both HF and chlorine. On October 21, 2021, a Honeywell employee died after being exposed to HF. On January 23, 2023, an incident at the Geismar facility resulted in an explosion and release of approximately 870 pounds of HF and 1,700 pounds of chlorine, leading to closure of nearby highways, workers sheltering in place at the facility, and $4 million in estimated property damage. The CSB investigation update as of July 2024 is available at https://www.csb.gov/assets/1/6/honeywell_geismar_investigation_update_-_final_2024.07.10.pdf. On June 7, 2024, a contract maintenance worker was exposed to HF at the facility and seriously injured. The CSB news report on these recent incidents is available at https://www.csb.gov/us-chemical-safety-board-launches-investigation-into-another-release-of-toxic-hydrofluoric-acid-at-honeywell-facility-in-geismar-louisiana/. As a NAICS 325 facility, Honeywell Geismar would have become subject the STAA practicability and implementation requirements after its initial accident. Thus, for over a decade, the need for such regulation has been clear. The STAA provisions in the 2024 Safer Communities final rule could help to improve chemical process safety by preventing similar accidents.

[20] CSB 2024. CSB Safety Study: Remote Isolation of Process Equipment. 2024. July 25. https://www.csb.gov/csb-safety-study-remote-isolation-of-process-equipment/.

consistent throughout the 2024 Safer Communities rulemaking, while the implementation of practicable ISTs as well as safer technologies identified through STAA has been an issue for comment not only in the 2022 Safer Communities proposed rule but throughout multiple rounds of substantive public comment (*E.g.*, listening sessions for the Safer Communities rule, the 2016 RMP amendments rule proposal (81 Fed. Reg. 13638, 13662-70 (March 14, 2016), the Supplemental Notice for the original RMP rule (60 Fed. Reg. 13526, 13534-35 (March 13, 1995)). As noted above, members of the RMP Coalition such as NACD and AFPM provided some of the cost information relied on in the economic analyses for the rule and members commented on the legal authority issues in this petition. Both ACC and API submitted comments to EPA on the proposed rule that cited to reports by the National Academy of Science, Engineering, and Medicine, the U.S. Department of Homeland Security and the State of New Jersey. These reports discuss at length a variety of costs, benefits, technical, operational and societal considerations relevant to analyzing STAA and IST/ISD.[21] The Petition fails to acknowledge that most of its members provided comments on the issues raised in the Petition, supporting the conclusion that it was not impracticable to raise the objections to the 2024 Safer Communities rule during the comment period.

B. **Petitioners Allege that the Final Rule's Expanded Information Availability Requirements Improperly Compel Disclosure of Additional Sensitive Information Without Adequate Justification**

i. **Petitioners allege that EPA inexplicably expanded both the universe of those who could request sensitive information and facilities' disclosure obligations in the final rule.**

Petitioners argue that the updated provisions in the 2024 Safer Communities final rule regarding the availability of information to the public are "arbitrary and capricious." Petitioners claim EPA expanded the pool of individuals who could request information, as well as the types of information that can be requested by members of the public, without providing an adequate rationale or justification.

Petitioners make several claims regarding the updated information availability requirements, including:
- "EPA inexplicably expanded the universe of those who could request this sensitive information to include individuals *'working, or spending significant time within 6 miles'* of the facility."
- "The expansion of the disclosure requirements to anyone who 'spends significant time' near a facility unreasonably resurrects the safety and national security concerns that led EPA to rescind these disclosure obligations in 2019."
- "…anyone—whether they work for a public interest group or an international terrorist organization—could claim to 'spen[d] significant time' near a facility, thereby obligating the facility to disclose sensitive hazard information."

As explained below, EPA finds that these claims do not require mandatory reconsideration. The CAA requires the Administrator to grant reconsideration when a petitioner raises an objection to the final rule that was impracticable to raise during the comment period or arose after the comment period but within 60 days of publication of the final rule and is of central relevance to the final rule (CAA

---

[21] See EPA-HQ-OLEM-2022-0174-0215 and EPA-HQ-OLEM-2022-0174-0233 available at www.regulations.gov.

307(d)(7)(B)). To deny a petition for reconsideration, EPA need not address the claim that the objection to the final rule provision is arbitrary and capricious (and potentially centrally relevant) if the information availability requirements of the final rule were adequately raised for comment by the proposed rule.

In the 2022 Safer Communities proposed rule preamble, EPA discussed restoring the information availability provisions of the 2017 amendments rule. 87 Fed. Reg. at 53599. The 2017 information availability provision was open to the "public," not just residents, and the 2022 Safer Communities proposed rule used the terms "public" and "community members," in addition to those living within 6 miles of a facility, to describe individuals who would be able to request information under this provision. *Id*. In the 2024 Safer Communities final rule, EPA provided clarity to those proposed provisions by conforming the regulatory text to what was described in the 2022 Safer Communities proposed rule. The 2024 Safer Communities final rule preamble therefore specified that "members of the public residing, working, or spending significant time in a 6-mile radius from the fenceline of the facility are able to submit information requests to a source."  89 Fed. Reg. at 17672. The 2024 Safer Communities final rule provision was thus a logical outgrowth of the 2022 Safer Communities proposed rule.

The 2022 Safer Communities proposed rule preamble also discussed the security concerns identified in the 2019 reconsideration rule as it relates to a Department of Justice (DOJ) report, ''Assessment of the Increased Risk of Terrorist or Other Criminal Activity Associated with Posting Off-Site Consequence Analysis Information on the Internet,'' and explained the goal of the 2022 proposed provision to "increase information availability to communities [in a manner] that balances information availability to communities with the previously identified security concerns." 87 Fed. Reg. at 53600. By limiting information availability to the public residing, working, or spending significant time within six miles of a stationary source, EPA also addressed the security concerns raised by DOJ's report regarding "widespread anonymous access to ...  consolidated information." *Id.* EPA received several comments regarding security concerns about the proposed information availability requirements, including comments from members of the RMP Coalition. *See, e.g.,* Comment from NACD, EPA-HQ-OLEM-2022-0174-0234; Comment from AFPM, EPA-HQ-OLEM-2022-0174-0268; Comment from API, EPA-HQ-OLEM-2022-0174-0233; Comment from U.S. Chamber of Commerce et al., EPA-HQ-OLEM-2022-0174-0272.[22] In the RTC, EPA addressed these concerns and stated, "EPA worked closely with Federal partners, including the DHS and the Federal Bureau of Investigation (FBI), to develop information availability requirements that strike a balance between security concerns and the need for sharing chemical hazard information with the public." RTC at 263. In the 2024 Safer Communities final rule preamble, EPA repeated this statement and added that "EPA believes that the finalized approach is consistent with existing requirements to secure sensitive information." 89 Fed. Reg. at 17674.

All final rule provisions were explicitly proposed by EPA and were thus available for public comment via EPA's 2022 Safer Communities proposed rule. In fact, members of the RMP Coalition submitted comments on the proposed information availability requirements. Therefore, EPA finds that these claims fail to meet the mandatory reconsideration criteria of being impracticable to raise during the comment period or arising after the comment period**.**

---

[22] All comments available at www.regulations.gov.

ii. **Petitioners allege that the final rule tries to shift responsibility for addressing safety and national security concerns to facilities.**

Petitioners claim that the 2024 Safer Communities final rule places responsibility on facilities to ensure individuals requesting information meet the "presence within 6-miles" requirement without providing adequate guidance for how this should be accomplished. Petitioners also claim that the requirement to "maintain a record of the members of the public requesting chemical hazard information for five years" (89 Fed. Reg. at 17692) was not included in the 2022 Safer Communities proposed rule or justified in the 2024 Safer Communities final rule.

EPA finds that these claims do not satisfy the requirements of mandatory reconsideration under CAA section 307(d)(7)(B). The issues of who could request chemical hazard information and the facility's involvement in the distribution of this information to requestors were raised for comment in the 2022 Safer Communities proposed rule, and EPA received public comments on these issues. Specifically, EPA proposed "to allow the public to request specific chemical hazard information if they reside within 6 miles of a facility… the 6-mile restriction would allow access to information for the vast majority of the public that are within worst case scenario impact zones. Having received such a request, the facility would be required to provide certain chemical hazard information and access to community emergency preparedness information. This proposal is similar to the 2017 amendments rule, with the added modification that information be restricted to those persons within 6 miles of the facility." 87 Fed. Reg. at 53599. The 2022 Safer Communities proposed rule preamble also states, "Allowing all community members demonstrating residence within 6 miles of the facility to request this information would ensure information availability in areas without [Local Emergency Planning Committees or Tribal Emergency Planning Committees] LEPCs/TEPCs." 87 Fed. Reg. at 53601. As described in the previous section, the inclusion of those working or spending significant time within six miles of a facility in addition to just "residing" is a logical outgrowth of the 2022 Safer Communities proposed rule. EPA's 2022 Safer Communities proposed rule thus gave adequate notice of its intent to provide chemical hazard information to members of the public within six miles of a facility.

Additionally, EPA sought comment on the six-mile limitation for requesting chemical hazard information. Specifically, the NPRM raised the issue of facilities needing to provide information to local requesters and needing to give "instructions for how to request the information" 87 Fed. Reg. at 53601. Inherent in soliciting comment on facilities needing to provide instructions on how to request information and on being required to provide information is a solicitation of comment on how to evaluate requests, as evidenced by the series of comments on the issue of determining whether requesters are in fact from the area. EPA also received several public comments in response to the 2022 Safer Communities proposed rule raising concerns regarding how the identity of requestors will be verified. RTC at 271 - 272. In response to these public comments, EPA finalized requirements for sources to provide instructions for how to request information, including verification of presence within six miles of the facility. Despite Petitioners arguments to the contrary, EPA did provide guidance for how this should be accomplished in the RTC by stating, "EPA expects facility owners and operators to notify the public that information is available in a variety of ways, such as using free or low-cost internet platforms, and social media tools that are designed for sharing information with the public. EPA also expects verification of the population within the 6-mile radius to be carried out through many methods, such as asking a member of the public to provide a utility bill for verification of residence, pay stub for verification of employment, or specific documentation to verify significant time spent within

the 6-mile radius. EPA encourages the facility owner or operator to coordinate information distribution and verification requirements with the LEPC or local emergency response officials to determine the best way to reach public stakeholders." RTC at 273.

EPA further clarified, "The final rule leaves substantial flexibility for facilities to design a process for obtaining verification and keeping records of requestors that allows for facilities to have a suitable, minimally burdensome process for themselves and the community. The final rule allows for a straightforward process that does not hinder the right of the public to access this information, allows facilities to be aware who has their information, and permits oversight by implementing agencies."  RTC at 272. EPA thus provided guidance on how facilities are to ensure individuals requesting information meet the "presence within 6-miles" requirement.

As for petitioners' claim that the recordkeeping requirement was not included in the 2022 Safer Communities proposed rule or justified in the 2024 final rule, EPA notes that recordkeeping is already required by the rule, as demonstrated by 40 CFR 68.200.[23] In other words, even if the final rule had not included the specific five year retention requirement within 40 CFR 68.210(h), owners and operators of stationary sources would have nonetheless been subject to a five-year recordkeeping provision from the requirements of 40 CFR 68.200. In response to a public commenter asking whether facilities would be required to keep records of people requesting information under the information availability provisions during the period for public comment,[24] EPA asserted that owners or operators are required to maintain a record of members of the public requesting information. RTC at 272. However, even within that recordkeeping requirement, the RTC further clarified that "[t]he final rule leaves substantial flexibility for facilities to design a process for obtaining verification and keeping records of requestors that allows for facilities to have a suitable, minimally burdensome process for themselves and the community." *Id.* The final requirement to keep a record of those requesting information was therefore a logical outgrowth of what was proposed in the 2022 Safer Communities proposed rule. Additionally, the petitioner's objection to this provision is not centrally relevant to the rule. While the placement of 40 CFR 68.210(h) is arguably more convenient for a reader of the regulation, due to the requirements of 40 CFR 68.200, the petitioner's obligation to retain records for five years is the same regardless of 40 CFR 68.210(h).

EPA therefore finds that these claims do not satisfy the criteria for mandatory reconsideration under CAA section 307(d)(7)(B) because the issue of which community members within 6-miles of a facility may request information from the facility was raised for comment, as was the process for requesting that information (that is, how to request and how, inherently, to determine the validity of the request). The extent of public comment on these issues demonstrates the public was sufficiently on notice of the issues, showing that they were not impracticable to raise during the period for public comment. Additionally, not only is the Agency's clarification of how facilities are to verify and keep records of requestors a logical outgrowth of the issues highlighted in our proposal, but also the objection to 40 CFR 68.210(h) is not centrally relevant to the outcome of the final rule because the requirement to keep records for five years is in accordance with the RMP rule's general recordkeeping requirements in

---

[23] 40 CFR 68.200: "The owner or operator shall maintain records supporting the implementation of this part at the stationary source for five years, unless otherwise provided in subpart D of this part."
[24] See EPA-HQ-OLEM-2022-0174-0220 available at www.regulations.gov.

40 CFR 68.200. Therefore, the objection to the five year recordkeeping provision does not provide substantial support for the argument that the regulation should be revised.

**C.      Petitioners Allege that the Final Rule Imposes Unnecessary Employee Participation Provisions**

> **i.      Petitioners allege that the final rule includes multiple, unexplained new requirements for employee participation in both Program 2 and Program 3 prevention programs.**

Petitioners allege that some of the requirements for employee participation were not subject to notice and comment, that the new provisions are unexplained, and that they are not appropriate, or cost justified. Petitioners specifically point to the requirements for "annual written or electronic notices to employees, additional training, additional methods for reporting unaddressed hazards, recordkeeping of such reports, and the ability to report unaddressed hazards either to the facility or EPA itself."

EPA finds that the public had adequate notice in the proposal of the revisions made in the 2024 Safer Communities final rule because the changes made in the 2024 Safer Communities final rule are minor clarifications or reduction in scope from the 2022 Safer Communities proposed rule. In the 2022 SCAAP proposed rule, EPA proposed to require a "process to allow employees and their representatives to anonymously report unaddressed hazards. . ." 87 Fed. Reg. at 53612. In addition to the proposed approach, EPA solicited comment in the 2022 Safer Communities proposed rule regarding "[r]elevant sources that have provided useful guidance in making risk decisions" and "[w]hether owners and operators should distribute an annual written or electronic notice to employees that employee participation plans and other RMP information is readily accessible upon request and provide training for those plans and how to access the information." 87 Fed. Reg. at 53558.

Commenters, including members of the RMP Coalition, provided input in response to the 2022 Safer Communities proposed rule on the implementation of the proposed employee participation provision. *See, e.g.*, Comment from the API, EPA-HQ-OLEM-2022-0174-0233; Comment from NACD, EPA-HQ-OLEM-2022-0174-0234.[25] As EPA explained in the 2024 Safer Communities final rule, the modifications made to the provisions regarding written or electronic notice and training clarify that workers should be properly informed of RMP information to prevent misinformed employees from reporting noncompliance, addressing a concern raised by NACD. EPA also addressed the methods for reporting noncompliance in the 2024 Safer Communities final rule preamble, stating, "To clarify EPA's intent in the proposal, EPA is specifically defining in this final rule that the process developed to report noncompliance must detail how to report to the owner or operator and/or EPA." 89 Fed. Reg. at 17665. Clarification of these proposed provisions on which EPA already solicited comment does not require mandatory reconsideration. The provisions of the 2024 Safer Communities final rule identified by the petition for reconsideration were a part of EPA's proposal and thus available for the public to comment on. Therefore, it was not impractical to raise these issues, nor did they arise after the comment period. Thus, the petition does not meet the criteria of CAA 307(d)(7)(B), and EPA denies reconsideration on the employee participation provisions raised in the petition.

---

[25] All comments available at www.regulations.gov.

**D. Petitioners Allege that the Final Rule Adds Two New Provisions Relating to Monitoring Equipment**

Petitioners claim that the 2024 Safer Communities final rule imposes two entirely new requirements relating to monitoring equipment, which did not appear in the 2022 Safer Communities proposed rule and are not the "product of reasoned decision-making." EPA addresses each of the petitioners' claims related to monitoring equipment below.

 **i. First requirement: Monitoring equipment associated with prevention and detection of accidental releases are required to have standby or backup power.**

Petitioners allege that the 2024 Safer Communities final rule imposes two requirements that were not raised for notice and comment. Petitioners allege that the requirement to "ensure monitoring equipment associated with prevention and detection of accidental releases from covered processes has standby or backup power to provide continuous operation" was an "entirely new requirement" imposed by the 2024 Safer Communities final rule. Additionally, petitioners stated that the phrase "associated with" is "incredibly vague and likely to sweep in far more equipment than necessary." However, EPA did seek comment on this new provision in the 2022 Safer Communities proposed rule. Specifically, EPA stated, "While EPA is not requiring implementation of standby or emergency power for the entirety of an RMP process, EPA is proposing to require air pollution control or monitoring equipment associated with prevention and detection of accidental releases from RMP-regulated processes to have standby or backup power to ensure compliance with the intent of the rule. EPA seeks comment and data on this proposed provision, particularly on any potential safety issues associated with it." 87 Fed. Reg. at 53571. Furthermore, members of the RMP Coalition provided comment on this proposed provision. *See e.g.,* Comment from SOCMA, EPA-HQ-OLEM-2022-0174.[26] This provision was plainly raised for comment and petitioners had the opportunity to, and in fact did, comment on the proposed changes, including concerns regarding monitoring equipment "associated with" preventing releases. Therefore, this claim does not meet the criteria for mandatory reconsideration.

 **ii. Second requirement: Operating procedures must document when monitoring equipment is removed due to safety concerns from imminent natural hazards.**

Petitioners allege that the requirement to document "when monitoring equipment associated with prevention and detection of accidental releases from covered processes is removed due to safety concerns from imminent natural hazards" was also not raised for comment. However, in the 2022 Safer Communities proposed rule preamble, EPA noted that "air monitoring and control equipment is often removed from service before natural disasters to potentially prevent damage" and sought comment on the proposed requirement to have standby or backup power and "any potential safety issues associated with it." 87 Fed. Reg. at 53571. EPA received several public comments in response to the 2022 Safer Communities proposed rule regarding air monitoring equipment and backup power. A couple of commenters stated that there was no support for EPA's concern that facilities will use extreme weather events as a reason to remove air monitoring and control equipment. RTC at 65. Other commenters believed this was a valid concern, and some called for EPA to enforce penalties to deter companies from turning off their monitoring equipment. *Id.* Based on these public comments, EPA modified the

---

[26] Comment available at www.regulations.gov.

proposed provisions in the 2024 Safer Communities final rule to clarify that there may be some instances where a shutdown of monitoring equipment would be appropriate and allowed, with proper recordkeeping and disclosure.

EPA's 2024 Safer Communities final rule preamble states:

> In response to comments regarding facilities' removal of air monitoring equipment, EPA notes that the final rule is revising 40 CFR 68.52(b)(9) and 68.69(a)(4) to require documentation of the removal of monitoring equipment for accidental releases during disasters in facility operating procedures. In doing so, the Agency addresses the concern that the threat of extreme weather events has, and will continue to be, used by some owners or operators to justify disabling equipment designed to monitor and detect chemical releases of RMP-regulated substances at their facility (87 FR 53571). To prevent accidental releases, RMP owners or operators are required to develop a program that includes monitoring for such releases. EPA does not believe all natural disasters should be treated as an exception to this requirement. However, EPA understands that, in some situations, such as hurricane winds, there is a potential for damage to, or by, monitoring equipment if not secured and allows a source to shut down monitoring equipment in such cases provided that an explanation is included in its RMP.

89 Fed. Reg. at 17640.

The Agency's provision in the 2024 Safer Communities final rule outlining how facilities should document removal of monitoring equipment when appropriate was thus a logical outgrowth of the 2022 Safer Communities proposed rule and the associated issues on which EPA explicitly sought comment. EPA clarifying its proposed provisions in the final rule does not meet the criteria for mandatory reconsideration.

## Conclusion

For all of the reasons discussed above, EPA concludes that this petition relating to the 2024 "Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act; Safer Communities by Chemical Accident Prevention" final rule fails to identify any information or circumstances that warrant mandatory reconsideration under section 307(d)(7)(B) of the CAA. Accordingly, the petition is denied, as well as the request that the 2024 Safer Communities final rule be stayed. I appreciate your comments and interest in this matter.

Sincerely yours,

Michael S. Regan



SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, D.C. 20005
+1 202 736 8000
+1 202 736 8711 FAX

AMERICA • ASIA PACIFIC • EUROPE

+1 202 736 8853
JSAVAGE@SIDLEY.COM

May 10, 2024

**By Email and First Class Mail**

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, DC 20460

> **Re:   Petition for Reconsideration and Request for Agency Stay Pending Reconsideration and Judicial Review of Final Rule entitled *Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act; Safer Communities by Chemical Accident Prevention***

Dear Administrator Regan:

Please find enclosed a petition for reconsideration and request for stay for the U.S. Environmental Protection Agency's final rule, *Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act; Safer Communities by Chemical Accident Prevention*, 89 Fed. Reg. 17,622, published in the Federal Register on March 11, 2024. This petition and request is filed on behalf of the RMP Coalition, consisting of the National Association of Chemical Distributors, d/b/a Alliance for Chemical Distribution, the American Chemistry Council, the American Fuel & Petrochemical Manufacturers, the American Petroleum Institute, the Chamber of Commerce of the United States of America, and the Society of Chemical Manufacturers & Affiliates.

Please contact me with any questions you may have.

Sincerely,

Justin A. Savage

CC:   Janet McCabe, Deputy Administrator, EPA
Dan Utech, Chief of Staff, EPA
Barry Breen, Principal Deputy Assistant Administrator, EPA

Sidley Austin (DC) LLP is a Delaware limited liability partnership doing business as Sidley Austin LLP and practicing in affiliation with other Sidley Austin partnerships.

| | |
|---|---|
| In re: Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act; Safer Communities by Chemical Accident Prevention | Docket No. EPA-HQ-OLEM-2022-0174 |

## PETITION FOR RECONSIDERATION

Pursuant to Section 307(d)(7)(B) of the Clean Air Act ("CAA" or the "Act"),[1] the National Association of Chemical Distributors, d/b/a Alliance for Chemical Distribution, the American Chemistry Council, the American Fuel & Petrochemical Manufacturers, the American Petroleum Institute, the Chamber of Commerce of the United States of America, and the Society of Chemical Manufacturers & Affiliates (collectively, "RMP Coalition") hereby petition the Administrator of the U.S. Environmental Protection Agency ("EPA" or the "Agency") to reconsider and rescind its final rule entitled *Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act; Safer Communities by Chemical Accident Prevention*, 89 Fed. Reg. 17,622 (Mar. 11, 2024) ("Final Rule"), and to stay the effective date of the Final Rule.[2]

The RMP Coalition shares EPA's goal of maintaining an effective Risk Management Program ("RMP") regulation that has driven remarkable improvements in process safety over the last 30 years. Members of the associations represented by the RMP Coalition, which are subject to the Final Rule's requirements, expend significant time and resources to promote process safety and to operate their facilities in a way that protects the environment and surrounding communities. The RMP Coalition thus supports reasonable and necessary regulations that are designed to further these goals.

However, the Final Rule is neither reasonable nor necessary to ensure that covered facilities remain safe, reliable, and operating in an environmentally sound way. The Final Rule instead imposes multiple unlawful and highly prescriptive mandates that undermine the performance-based flexibility that is the linchpin of process safety. The Final Rule's requirements will inevitably create confusion, impose undue burdens (including burdens on members of the RMP Coalition's

---

[1] 42 U.S.C. § 7407. EPA promulgated the Final Rule under its authority in Section 112(r) of the CAA to issue rules to prevent, detect, and respond to accidental releases of regulated substances. CAA Section 112(r)(7)(E) provides that regulations or requirements under that subsection are to "be treated as a standard in effect under [CAA Section 112] subsection (d)," which in turn are subject to the rulemaking and review procedures of Section 307(d). Thus, rulemaking and petition requirements of Section 307(d) apply to regulations issued under Section 112(r).

[2] EPA added significant new materials to the docket after the promulgation of the Final Rule. The RMP Coalition reserves the right to supplement this petition with additional material.

associations), divert resources, and force the regulated community to expend significant time and resources on investments and activities that accomplish little to no safety benefits.

These substantive deficiencies are compounded by the significant procedural flaws in this rulemaking. Despite a nearly decades-long RMP regulatory history and successful implementation of RMP requirements (including by members of the associations represented by the RMP Coalition), EPA imposed several new requirements that tripled the cost of the Rule yet appeared for the first time in the Final Rule, depriving the public of an opportunity to comment. Similarly, the Agency offered several new legal and technical rationales to defend the Final Rule that never appeared in the proposal or the proposed rule docket.[3]

The RMP Coalition therefore files this petition to raise objections that either were impracticable to raise during the comment period or arose subsequent to the end of the comment period and are of central relevance to the Final Rule. Section 307(d)(7)(B) of the CAA thus requires EPA to "convene a proceeding for reconsideration of the rule" and impart all the procedural rights that "would have been afforded had the information been available at the time the rule was proposed."[4]

An administrative stay is appropriate and necessary in order for EPA to remedy the Final Rule's deficiencies. The RMP Coalition requests that EPA grant a 90-day stay of the Final Rule pending reconsideration pursuant to Section 307(d) of the CAA. The RMP Coalition is ready and willing to work with EPA, the Occupational Safety and Health Administration ("OSHA"), and other federal stakeholders to assist in improving chemical accident prevention, mitigation, and detection regulations to ensure that operations at RMP-regulated facilities are reliable, safe, and environmentally sound.

## BACKGROUND

EPA's failure to give the public an opportunity to comment on numerous provisions of the Final Rule is remarkable given the highly controversial back and forth between the Obama, Trump, and Biden administrations over revisions to the RMP. In 2013, following a catastrophic accident at a fertilizer plant in Texas, President Obama issued Executive Order 13650, directing EPA and other agencies "to enhance safety and security in chemical facilities by modernizing key policies, regulations, and standards," including the RMP.[5] In response, EPA published a proposed rule amending the RMP regulations in March 2016.[6] Despite strenuous objection from the regulated

---

[3] EPA, *Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act; Safer Communities by Chemical Accident Prevention*, 87 Fed. Reg. 53,556 (Aug. 31, 2022) ("Proposed Rule").

[4] 42 U.S.C. § 7607(d)(7)(B).

[5] Exec. Order No. 16,350, *Improving Chemical Facility Safety and Security*, 78 Fed. Reg. 48,029, 48,031(Aug. l, 2013).

[6] EPA, *Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act*, 81 Fed. Reg. 13,638 (Mar. 14, 2016).

community, EPA published a final rule in January 2017—just days before the end of the Obama Administration.[7]

In February 2017, the RMP Coalition filed a petition for reconsideration of the Obama Administration's eleventh-hour action, and EPA's Administrator convened a proceeding to reconsider the 2017 Amendments. EPA also issued several stays of the 2017 Amendments before ultimately publishing a new rulemaking that rescinded many of the Obama Administration's changes to the RMP, finding those changes to be "no longer . . . reasonable or practicable."[8]

Following yet another change in administration, EPA acted in August 2022 to propose reinstating many of the requirements that had been rescinded by the Trump Administration in 2019. The comment period on the 2022 proposed rule closed on October 31, 2022, and despite serious opposition by members of the RMP Coalition and the regulated community, EPA published the Final Rule on March 11, 2024. The Final Rule goes into effect on May 10, 2024.

## ISSUES MERITING RECONSIDERATION

EPA should reconsider the Final Rule because multiple procedural deficiencies deprived stakeholders of a full and fair opportunity to comment on the Final Rule's requirements. These deficiencies included numerous additions to the Final Rule that did not appear in the Proposed Rule. For example, the Final Rule takes the unprecedented step of mandating that certain facilities implement measures identified during a safer technology and alternatives analysis ("STAA"), which dramatically increased the cost of the Final Rule.[9] The Final Rule arbitrarily requires facilities to favor certain types of mitigation measures over others and forbids them from declining to implement those measures based on their cost alone, no matter how severe the cost. EPA's Final Rule also changes the scope of EPA's information-availability provisions, the extent of employee participation in hazard reviews, and the type of information included in facility hazard reviews or process hazard analyses ("PHA").

EPA's failure to provide adequate notice of these changes obligates the Agency to convene a reconsideration proceeding so that stakeholders can comment on these changes in the first instance. These changes are also independently arbitrary and unlawful. For many, EPA provided no reasoned justification for their adoption or justified them based on untenable legal rationales. EPA also failed to grapple with the consequences of the new requirements. EPA must reconsider the Final Rule to remedy its serious substantive and procedural defects.

---

[7] EPA, *Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act*, 82 Fed. Reg. 4,594 (Jan. 13, 2017) ("2017 Amendments").

[8] EPA, *Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act*, 84 Fed. Reg. 69,834 (Dec. 19, 2019) ("2019 Reconsideration Rule").

[9] 89 Fed. Reg. at 17,651, 17,689.

## I. The Multitude of Procedural Flaws and Added Requirements in the Final Rule Precluded Effective Notice and Comment.

Numerous procedural deficiencies in EPA's Final Rule prevented RMP Coalition members from being able to comment effectively on the provisions of and support for EPA's Final Rule. Because of these flaws, the Final Rule should be reconsidered.

### A. The Final Rule Unlawfully Mandates New and Extraordinarily Burdensome STAA Requirements.

EPA's Final Rule not only requires facilities to *conduct* STAAs, but also mandates that they *implement* some measures identified by the STAAs. For the following reasons, the Final Rule's implementation mandate is unlawful and unjustified. It requires reconsideration.

As a threshold matter, EPA deprived RMP Coalition members of the ability to meaningfully comment on the implementation mandate by including it only in the Final Rule. Indeed, the Proposed Rule stated that "EPA is *not* requiring facilities to implement identified inherent safety measures,"[10] which indicated that such a requirement was not within the scope of the proposed rulemaking. And although the Proposed Rule solicited comments on whether the Agency should require implementation of inherently safer technology/inherently safer design ("IST/ISD") and STAAs,[11] the Agency did not specifically solicit comments on the relative benefits of implementing passive measures, active measures, or procedural measures. Most importantly, none of the particulars of the Final Rule's implementation mandate or its extensive new regulatory language were available for the public to comment on or even consider. This failure to permit public input on the Final Rule's requirements is unjustified, and EPA should reconsider the STAA requirements on that basis alone.

In addition to the inadequacy of the Agency's notice, the new provisions imposing the implementation mandate are themselves arbitrary and unlawful. The implementation mandate applies to many types of RMP-regulated facilities: chemical, coal, or petroleum manufacturing facilities "located within one mile of another" such facility; facilities with hydrofluoric acid alkylation ("HF") covered processes; and chemical, coal, or petroleum manufacturing facilities with one RMP-reportable accident since the most recent PHA.[12] But EPA fails to provide a sufficient reasoned basis for imposing massive costs on these specific facilities. Indeed, the Final Rule acknowledges that STAA implementation would account for more than half of the total cost of the RMP amendments—between $169 million and $205 million in annualized costs. Basic principles of reasoned decisionmaking require that the Agency explain itself more thoroughly before targeting these categories of facilities for unjustified burdens and costs.

The implementation mandate's onerous requirements are also arbitrary and unjustified. Covered facilities must implement "at least one passive measure at the stationary source, or an inherently safer technology or design, or a combination of active and procedural measures

---

[10] 87 Fed. Reg. at 53,575 (emphasis added).

[11] *See* 87 Fed. Reg. at 53,580.

[12] 89 Fed. Reg. at 17,689.

equivalent to or greater than the risk reduction of a passive measure."[13] Under this implementation hierarchy, "[i]f no passive measures are identified or all are not practicable, and no inherently safer technology or design is implemented, then the owner or operator shall implement at least one active measure," and "[i]f no active measures are identified or all are not practicable, the owner or operator shall implement at least one procedural measure."[14] How this hierarchy will work in practice, however, is far from clear. Suppose a facility's STAA identifies a passive measure that is extremely costly and provides only moderate risk reduction. The Final Rule's implementation mandate could be read to require a facility to adopt that costly passive measure before adopting a far less costly procedural measure that is nearly equivalent in risk reduction. This could occur so long as the passive measure was "practicable" under the Final Rule and therefore preferred.

That is not the only strange or uncertain implication of the Final Rule. For example, the Final Rule appears to assume that a facility does not already have existing passive measures, such as berms and pressure vessels, employed for a given process. If such measures are already in place, then the Final Rule would be requiring additional, perhaps duplicative or redundant measures for an already safe process. Likewise, the Final Rule also does not address how its requirements apply to sites with multiple—e.g., 20—PHAs, leaving open the possibility that such sites must implement mitigation measures for each PHA, requiring multiple mitigation measures each year. Put differently, the rule is unclear as to whether a mitigation measure is required every 5 years (a PHA cycle), or whether the new regulation requires a mitigation measure every time a PHA is conducted at a covered source. Likewise, if mitigation measures are required because a process unit had a reportable event, the Final Rule does not specify whether the mitigation measure must be implemented at that same process unit. The Agency did not grapple with these issues or resolve these questions because stakeholders never had a chance to comment on these new, unclear requirements.

The Final Rule also imposes a definition of which measures are "practicable" that violates Section 112 and is unworkable. Again, facilities must document why measures they decline to adopt are not "practicable." But the Final Rule provides that "[a] claim that implementation is not practicable shall not be based solely on evidence of reduced profits or increased costs."[15] The upshot is that even if a passive measure is so costly that it would bankrupt a facility to implement it, that measure could still be "practicable" (and thus required) under the Final Rule. But the term "practicable" inherently includes at least some consideration of whether a course of action is financially "feasible"[16] or economically justified. EPA has previously rejected calls to limit consideration of costs in this way, explaining "that the Agency believes that cost is a valid

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *See* Black's Law Dictionary (6th ed. 1990).

consideration for practicability."[17] The Agency has not met its burden under *FCC v. Fox Television Stations, Inc.*,[18] to acknowledge and explain this reversal.

Nor is EPA empowered to define "practicable" any way it wishes. Section 112 of the Clean Air Act itself requires that the RMP regulations be "practicable" *and* that they be "reasonable."[19] And Section 112 expressly contemplates that something could be "not practicable due to . . . *economic* limitations."[20] Yet the Final Rule's arbitrary and capricious definition of "practicable" effectively prohibits facilities from conducting a common-sense assessment of whether a given measure is cost justified. That plainly contradicts Section 112 and basic principles of reasoned decisionmaking. Indeed, it is hard to see how EPA's rule itself could be practicable when it requires impracticable implementations.

Finally, even if the particulars of the implementation mandate were reasonable (which they are not), the mandate itself would still be unlawful because EPA lacks the authority to mandate adoption of IST/ISD. EPA claimed its authority to adopt the implementation mandate based on a legal rationale that appears nowhere in the Proposed Rule. According to EPA, it is "clear on the face of the statute" that "the CAA authorizes EPA to require implementation of IST/ISD and other STAA measures" because "both subparagraphs (A) and (B) of CAA section 112(r)(7) authorize requiring implementation of safer technologies."[21] That is wrong. Subparagraph (B) of Section 112(r)(7) covers only "the use, operation, repair, replacement, and maintenance of equipment to monitor, detect, inspect, and control" accidental releases.[22] Nothing in that language suggests that EPA may require facilities to mothball existing technologies and adopt wholly new technologies or processes. As for subparagraph (A), that at least refers to regulations covering "design . . . requirements."[23] But subparagraph (A) is plainly aimed at "design . . . requirements" for *new* processes; it cannot be fairly read to permit EPA to require that all facilities' existing processes be thrown out based on new process designs.[24] Yet that is precisely the implication of EPA's interpretation of Section 112(r)(7). On the Agency's telling, it could mandate that all RMP-covered facilities adopt entirely new IST/ISD for all their covered processes.

---

[17] 82 Fed. Reg. at 4637 ("EPA also disagrees with the suggestion to limit consideration of reduced profits when assessing a risk management measure[.]").

[18] 556 U.S. 502, 515 (2009).

[19] 42 U.S.C. § 7412(r)(7)(B)(i).

[20] *Id.* at § 7412(h)(2)(B) (emphasis added).

[21] 89 Fed. Reg. at 17,644.

[22] 42 U.S.C. § 7412(r)(7)(B)(i).

[23] *Id.* at § 7412(r)(7)(A).

[24] Additionally, EPA had never relied on subparagraph (A) in any RMP rulemaking before the 2017 Final Rule. The Agency's 2016 proposed RMP amendments had invoked only subparagraph (B), but when stakeholders argued that the text of that subparagraph provided no authority for STAA, the Agency changed course in the Final Rule and invoked subparagraph (A). The Agency's relatively recent invocation of subparagraph (A) undermines the agency's reliance on it here.

The authority to impose a mandate to adopt IST/ISD for all processes, however, presents a "major question" that would require "clear congressional authorization."[25] For one thing, such a mandate would have "vast economic . . . significance."[26] After all, the Final Rule acknowledges that even its comparatively modest STAA implementation mandate may impose several hundred million in annualized costs. A much broader mandate would clearly "entail billions of dollars in compliance costs."[27] Whether to mandate STAA is also a question of great "political significance,"[28] as evidenced by the fact that Congress has repeatedly considered and rejected CAA amendments that would have allowed EPA to mandate IST.[29] Congress's "consistent judgment" against empowering EPA to mandate STAA undercuts the Agency's claim to congressional authorization.[30]

Nor can EPA duck the major questions doctrine by arguing that its mandate is, for the time being, more modest. In applying the major questions doctrine, the Supreme Court has focused on the *implications* of the underlying claim of authority—not just the direct effects of the action at issue.[31] Here, the implications of the Final Rule's implementation mandate—the ability for EPA to potentially require the redesign and rebuilding of *all* covered processes—plainly involve economic and political questions that suffice to trigger major questions scrutiny. Yet nothing in subparagraph (A) or (B) provides the clear authorization for the mandate that the major questions doctrine requires.

In sum, the Final Rule's implementation mandate is arbitrary and unlawful in multiple respects. Moreover, the RMP Coalition members' objections to the STAA requirements in the Proposed Rule were serious and are still relevant to the rule as finalized, highlighting the lack of meaningful safety benefit the STAA provides, EPA's use of flawed data, and the overbroad and arbitrary nature of the requirements.[32] But the implementation mandate involves the most troubling set of requirements. Because of the defects in that mandate—and because the RMP Coalition members were deprived of an adequate opportunity to comment on those defects in the first instance—the Agency should reconsider its Final Rule.

---

[25] *See West Virginia v. EPA*, 142 S. Ct. 2587, 2595 (2022).

[26] *See id.* at 2605.

[27] *See id.* at 2604.

[28] *See id.* at 2605.

[29] *See, e.g.*, Chemical Security Act of 1999, S. 1470, 106th Cong. § 3(b) (1999); Chemical Security Act of 2001, S. 1602, 107th Cong. § 3(7) (2001); Chemical Facilities Security Act of 2003, S. 994, 108th Cong. (2003).

[30] *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 147–48, 160 (2000).

[31] *See id.* at 2612 ("[O]n this view of EPA's authority, it could go further, perhaps forcing coal plants to 'shift' away virtually all of their generation—*i.e.*, to cease making power altogether."); *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) ("Under the Government's reading of the HEROES Act, the Secretary would enjoy virtually unlimited power to rewrite the Education Act.").

[32] AFPM Comments at 37–45.

B. <u>The Final Rule's Expanded Information Availability Requirements Improperly Compel Disclosure of Additional Sensitive Information Without an Adequate Justification.</u>

Back in 2017, EPA introduced new information availability requirements, which required facilities to provide sensitive chemical hazard information to any member of the public who requested it. EPA then rescinded those requirements in 2019 on the ground that the Agency had mistakenly "underweighted security concerns" regarding "the negative effects on public safety from the utility to terrorists and criminals of the newly available information and dissemination methods."[33] EPA's 2022 Proposed Rule then sought to reinstate the general information-availability requirements but mitigate their national security implications by allowing only individuals residing within 6 miles of a facility to request the facility's chemical hazard information.[34]

In the Final Rule, EPA inexplicably expanded the universe of those who could request this sensitive information to include individuals "*working, or spending significant time* within 6 miles" of the facility.[35] The Final Rule simultaneously expanded facilities' disclosure obligations to include: declined recommendations and justifications from IST/ISD analyses; natural hazard, power loss, and siting hazard evaluations; and RAGAGEP gap analyses.[36] These changes—and the concomitant verification and documentation requirements—raise a host of unaddressed security concerns and must be set aside as arbitrary and capricious.

The expansion of the disclosure requirements to anyone who "spends significant time" near a facility unreasonably resurrects the safety and national security concerns that led EPA to rescind these disclosure obligations in 2019. Nor does the Final Rule satisfy the Agency's burden under *FCC v. Fox Television Stations, Inc.* to explain its repudiation of its 2019 position.[37] The problem, of course, is that anyone—whether they work for a public interest group or an international terrorist organization—could claim to "spen[d] significant time" near a facility, thereby obligating the facility to disclose sensitive hazard information. On this point, the Final Rule simply states that EPA interprets "spending significant time as frequently using services, volunteering, visiting with family or friends, etc."[38] EPA's reliance on the word "etc." speaks volumes. It highlights that there is no objective standard that facilities can use to determine what qualifies as "spending significant time" near a facility. The Final Rule's sparse analysis of this expansion unreasonably fails to grapple adequately with these concerns.[39]

---

[33] 84 Fed. Reg. at 69,885.

[34] 87 Fed. Reg. at 53,600.

[35] 89 Fed. Reg. at 17,692 (emphasis added).

[36] *Id.* at 17,692.

[37] *FCC*, 556 U.S. at 515.

[38] 89 Fed. Reg. at 17,672.

[39] One issue the Final Rule leaves unaddressed, for instance, is how often in the past decades RMP incidents have had impacts beyond one mile. EPA presented no data for stakeholders to comment on or judge the reasonableness of the 6-mile radius requirement.

Rather than mount a defense of this expansion, the Final Rule tries to shift responsibility for addressing the safety and national security concerns to facilities, by requiring the facilities themselves to develop mechanisms for verifying that individuals requesting information satisfy the "presence within 6-miles" requirement.[40] Yet EPA provides no guidance to regulated facilities regarding how they should accomplish this task. EPA justifies its failure to give facilities adequate guidance on the theory that the Final Rule "leaves substantial flexibility for facilities to design a process for obtaining verification."[41] But EPA and other federal agencies—rather than refineries, chemical plants, and other RMP-regulated facilities, many of which are small businesses—are best qualified and best situated to "design a process" for protecting sensitive information with massive national security implications. Yet EPA anomalously places the industry in the position of the "regulator," tasked with determining which individuals may access sensitive information.[42] This simply highlights the arbitrary nature of the Agency's expanded requirement.

The same is true of the Final Rule's new requirement that facilities "maintain a record of the members of the public requesting chemical hazard information for five years."[43] The Final Rule offers no justification for imposing these requirements—and the Final Rule again makes facilities responsible for dealing with the negative effects of expanding the RMP's information availability requirements. Nor does EPA plausibly tie these information availability and reporting requirements to the Agency's grant of accident prevention or mitigation authority in Section 112(r). EPA claims that these requirements will contribute to "measures for emergency response," but the Agency does little to explain how.[44] And for certain of the information availability requirements—*e.g.*, declined recommendations in hazard evaluations—the Agency's authority to regulate is even more tenuous. EPA cannot credibly claim these requirements relate to emergency response, so it changes tack and weakly claims that their rules will motivate facilities to "further improve their safety performance in response to *community oversight*."[45]

And, again, because EPA's Proposed Rule included none of these problematic requirements, the RMP Coalition members had no way to raise these objections or offer alternative solutions in the first instance. EPA's failure in that regard violated the APA's notice and comment requirements and prevented the Agency from taking into account these important safety and national security concerns—concerns that EPA itself highlighted in its 2019 Reconsideration Rule.

C. The Final Rule Imposes Additional, Unnecessary Employee Participation Provisions.

The RMP Coalition recognizes the great value that employee participation provides in ensuring safe workplaces. Ensuring safe facilities—both for employees and for the surrounding

---

[40] 89 Fed. Reg. at 17,692.

[41] *Id.* at 17,673.

[42] Nor does EPA explain what would happen if two facilities located next to each other come to different conclusions on how to enforce these requirements. Would the facility that denies an individual information be in violation of the RMP regulations simply because a neighboring facility allowed that same individual access to the information? Again, the Agency does not grapple with these difficult questions.

[43] 89 Fed. Reg. at 17,692.

[44] *Id.* at 17,631.

[45] *Id.* at 17,641 (emphasis added).

communities—is the RMP Coalition's top priority. Substantial employee participation, however, is already required by OSHA's parallel Process Safety Management ("PSM") program. And given OSHA's expertise in (and responsibility for) ensuring worker safety, it is unclear why EPA would deviate from the PSM's requirements. EPA's Proposed Rule nonetheless included new employee participation requirements. And now the Final Rule has imposed further employee participation requirements. EPA's decision to surprise stakeholders with these extra requirements lacks a reasoned basis and requires reconsideration.

Again, the immediate and most apparent procedural deficiency is the inclusion of multiple new requirements for employee participation in both Program 2 and Program 3 prevention programs that were not included in the Proposed Rule, including: annual written or electronic notices to employees, additional training, additional methods for reporting unaddressed hazards, recordkeeping of such reports, and the ability to report unaddressed hazards either to the facility or EPA itself.[46] None of these requirements appeared in the Proposed Rule, and, therefore, EPA deprived RMP Coalition members of the fair notice and meaningful opportunity for comment that the APA requires. That alone justifies reconsideration.

The new employee participation provisions themselves are also largely unexplained. EPA's Proposed Rule acknowledged RMP incidents are typically followed by amendments to "specific prevention program areas" rather than increased employee participation requirements.[47] Put differently, a *lack* of employee participation is generally not the cause of an RMP-reportable release. The lack of any obvious benefit resulting from increased employee participation should require the Agency to thoroughly explain why additional requirements are justified. Yet in its Final Rule EPA provides no data or reasoned basis for believing that the Final Rule's new requirements are appropriate or cost-justified. Nor does EPA provide data to support the Agency's *belief*[48] that the additional employee participation requirements will enhance process safety. Principles of reasoned decisionmaking require the agency to do more.

In sum, EPA's Final Rule added these new employee participation requirements with no notice to the regulated community, despite the increased burdens that the requirements impose. Commenters had no opportunity to assess the new provisions, question their usefulness, or suggest changes. EPA should therefore reconsider its Final Rule to allow RMP Coalition members and the regulated community to have a meaningful opportunity to comment on the new employee participation requirements.

D. <u>The Final Rule Adds New Provisions Relating to Monitoring Equipment.</u>

The Final Rule also imposed two entirely new requirements aimed at supporting the continuous operation of monitoring equipment. The first requires that hazard reviews and PHAs include confirmation that "monitoring equipment associated with prevention and detection of accidental releases from covered processes has standby or backup power to provide continuous

---

[46] 89 Fed. Reg. at 17,688, 17,691.

[47] 87 Fed. Reg. at 53,591.

[48] Indeed, the Final Rule's reliance on EPA's "belief"—the Final Rule uses a form of that word over 120 times—rather than on data and rigorous analysis is notable throughout the Final Rule.

operation."[49] The second requires that operating procedures document "when monitoring equipment associated with prevention and detection of accidental releases from covered processes is removed due to safety concerns from imminent natural hazards."[50] EPA's inclusion of these requirements violated the APA because neither requirement appeared in the Proposed Rule. And neither requirement is the product of reasoned decisionmaking.

Consider the first requirement. The Final Rule concedes that "there may be processes that do not require backup power," yet EPA inflexibly concludes that *all* monitoring equipment "associated with" preventing releases must have backup power.[51] Not only is the qualifying phrase "associated with" incredibly vague and likely to sweep in far more monitoring equipment than necessary,[52] but the Final Rule does not justify or adequately explain this new requirement. The Final Rule states that "once a facility has made and documented the determination that it is appropriate to have monitors for accidental releases, then ensuring their operation through requiring backup power is an appropriate operational requirement."[53] But this explanation essentially penalizes facilities for having monitors and, given the often massive cost of backup or standby power, creates the perverse incentive not to have monitors in the first place. The Agency failed to grapple with these perverse incentives.

The standby and backup power generation requirement also exceeds EPA's statutory authority. EPA justified the requirement based on its Section 112(r)(7)(A) authority to require "monitoring."[54] But that is a non sequitur. The authority to require monitoring at a facility does not imply the authority to dictate how that facility generates its power.

The requirement related to imminent natural hazards has similar defects. The burdens associated with documenting the removal of monitoring equipment may dissuade some facilities from doing so, even though EPA's Final Rule acknowledged that "in some situations, such as hurricane winds, there is a potential for damage to" monitoring equipment unless it is removed.[55] Tornadoes, too, are a paradigm case of a weather event that is unforeseeable and uncontrollable and may require facilities to act decisively to prevent damage to critical equipment. EPA's requirement will penalize facilities that must make difficult decisions regarding equipment removal, employee safety, and other factors during exigent circumstances. EPA acted unreasonably by failing to recognize and address these concerns.

---

[49] 89 Fed. Reg. at 17,686–88.

[50] *Id.* at 17,686.

[51] 89 Fed. Reg. at 17,639.

[52] For example, EPA's discussion of these requirements seems to assume that they apply to ambient monitors *outside* the process at issue. But the language would also sweep in monitoring equipment that monitors specific parameters *within* the process. After all, arguably most parameters that are monitored are in part designed to prevent accidental releases by keeping the process within the control parameters. EPA did not grapple with or address the potential scope of this requirement.

[53] *Id.* at 17,639.

[54] *Id.* at 17,640.

[55] *Id.* at 17,640.

## REQUEST FOR CAA 307(d) STAY PENDING RECONSIDERATION

While EPA is reconsidering a rule, Section 307(d)(7)(8) of the Clean Air Act permits EPA to stay the effectiveness of that rule "for a period not to exceed three months."[56] Such a stay gives the Agency time to reconsider its position and review the rule's requirements without imposing unnecessary compliance costs on regulated entities. EPA may also use a Section 307(d) stay to avoid any confusion in the regulated industry from the Agency's implementing and then quickly revising its regulatory requirements. Staying the effective date of the rule until EPA completes its reconsideration process avoids any such regulatory whiplash.

The RMP Coalition respectfully requests that EPA exercise this authority under the CAA to stay the effectiveness of the Final Rule to the fullest extent permissible by statute pending reconsideration. Facilities with RMP covered processes will begin to incur significant compliance costs such as rule familiarization, training, revising manuals and operating procedures, and conducting PHAs and the requisite STAAs. Staying the rule during reconsideration will avoid imposing these compliance costs prematurely and will avoid confusion among facility personnel from being trained on potentially unnecessary, and indeed invalid and arbitrary, requirements imposed by the Final Rule. A stay would afford EPA the needed time to fully reconsider its Final Rule.

## CONCLUSION

For the above reasons, the RMP Coalition requests that EPA reconsider its Final Rule and stay the effective date of the Final Rule for the duration of the administrative proceedings.

May 10, 2024

Respectfully submitted,

/s/ *Justin A. Savage*

Justin A. Savage
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8853
jsavage@sidley.com

*Counsel for the RMP Coalition*

---

[56] 42 U.S.C. § 7607(d)(7)(B).